Berta **MORALES**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 99–CM–91.

District of Columbia Court of Appeals.

Submitted Jan. 27, 2004.
Decided Jan. 13, 2005.

William G. Dansie for appellant.

Robert J. Feitel, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and Barbara J. Valliere, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and REID and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Police came to the home of Berta Morales, a Spanish-speaking immigrant from El Salvador, to question her about injuries her twelve-year-old son had sustained. After Morales admitted that she had hit her son with a belt, she was arrested. Her inculpatory statements to the police were introduced in evidence against her at trial as part of the prosecution's case-in-chief, and she was found guilty of simple assault. Morales now appeals the trial court's denial of her pretrial motion to suppress her statements. She claims that the police violated her rights under the Fifth Amendment of the United States Constitution and the Interpreter Act, D.C.Code §§ 2–1901 et seq. (2001), by subjecting her to a custodial interrogation without first giving her *Miranda*[1] warnings or providing her with a qualified interpreter.

The outcome of Morales's appeal turns on whether, taking all the circumstances into consideration, her interrogation was "custodial" in nature. We conclude that it was not and that her rights therefore were not violated. We affirm Morales's conviction.

## I.

The trial court denied Morales's motion to suppress her statements after an evidentiary hearing at which it took testimony from Morales and Metropolitan Police Officer Andres Marcucci, Jr.[2] The court's findings and conclusions in support of its ruling were not transcribed and are not included in the record on appeal. We therefore rely exclusively on the transcript of the witnesses' testimony to summarize the material facts.[3]

On January 30, 1998, a teacher at Lincoln Middle School noticed suspicious markings on the body of twelve-year-old N.C., a sixth grade student at the school. The teacher contacted a school counselor, who examined N.C. and found "some markings which [she] considered to be severe in his left arm." N.C. explained that his mother had hit him with a belt. The counselor contacted Child Protective Services.

When N.C. did not return home from school that afternoon at the usual time, his mother, appellant Morales, telephoned the police. She was told that the police would be coming to see her that evening. Shortly

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Morales testified at the motion hearing and at trial in Spanish. Her testimony was translated by a court interpreter. The English-language parts of the hearing and trial were translated into Spanish for Morales's benefit.

3. The omission of the trial court's findings and conclusions appears to have been caused by a tape recording malfunction or else a transcription error of some kind. Neither

party to this appeal has sought to rectify the omission by supplementing the record. *See* D.C.App. R. 10(c). Although the transcript also contains frequent references to testimony that was "indiscernible," the bulk of the testimony is intact, and the parties express no concern that any gaps are material or impede our review. Absent any claim of prejudice by either appellant or appellee, we are satisfied that we have a sufficient record on which to decide this appeal. *See Cole v. United States,* 478 A.2d 277, 280–86 (D.C.1984).

thereafter, Detective Cheryl Wright–Smith, Officer Marcucci, and a child welfare worker arrived at Morales's apartment. N.C. was with them. "Grateful that they had brought him," Morales invited the police in. The officers asked N.C. to remain in a different room while they spoke with Morales in her living room. Several other persons were present elsewhere in the apartment, including Morales's other son and an adult family member.

Berta Morales is an immigrant from El Salvador who speaks little English. Anticipating that fact, Detective Wright–Smith had asked Officer Marcucci to accompany her to Morales's apartment to serve as an interpreter. Morales testified that Officer Marcucci "speaks Spanish very well" and that she was "able to understand everything he said." [4] The interview of Morales was conducted through Officer Marcucci's interpretation. The interview lasted a bit more than thirty minutes. It culminated in Morales's arrest.

Detective Wright–Smith explained to Morales that the police were there on account of the marks found on N.C.'s body. Morales understood that the police had "received a report that [she] yesterday punished [her] son," and that this was the reason her son had not come home that afternoon. Morales acknowledged that she had punished N.C., but when the police showed her photographs of his injuries, she denied having "done this" to him. She testified that the police responded that "yes, you have done it, you yourself have just stated that you punished him."

Detective Wright–Smith then asked Morales "several times" whether she had struck N.C. with an umbrella, which Morales repeatedly denied. Officer Marcucci testified that Morales gave "three different answers" to explain the marks on N.C.'s arms: "One was that he was in a fight at school ..., one was that he fell from a bicycle, and ... one was that he was horsing around, that he liked to play fight a lot."

At some point during the questioning, Morales attempted to go to the next room to get N.C. but was prevented from doing so. According to Officer Marcucci, Detective Wright–Smith "stopped her," saying, "no, we don't need him right here right now." Morales "said okay" when Detective Wright–Smith "said we gotta finish what we're doing here first before we call him." When asked whether Morales "was free to go get her son," Officer Marcucci testified that "at that moment we told her not to, just leave him where he was at." According to Morales herself, she wished to get N.C. from the next room in order to "tell me in front of the police ... why it was they were telling me that my child had stated that I had hit him with an umbrella." Morales told the police three times that she wanted to see her son, and "they would not let me speak to him." Officer Marcucci, she testified, "got in front of me and he said wait, wait, not to proceed." When asked on direct examination whether at this point she felt she was under arrest, Morales replied, "Yes, I felt bad."

Later during the interview, N.C. was brought into the living room. Morales testified that she was not able to go near her son because Officer Marcucci "was there between the two of us." Officer Marcucci confirmed that he and Detective Smith positioned themselves between N.C. and his mother.

---

4. Officer Marcucci is not a qualified interpreter listed with the District of Columbia's Office of Interpreter Services. While he speaks Spanish fluently (having learned it at home), he testified that he cannot read or write the language.

Eventually Morales said to the police that while she had not hit N.C. with an umbrella, she "had used a belt." Morales explained that she "constantly ha[d] to be punishing" N.C. because he was "a bad kid" who "doesn't listen." She insisted, however, that she had "never used any ... other object to ... strike the child."

After Morales made these admissions, she was placed under arrest for assaulting her son.[5] The officers recovered an item from her apartment that Morales indicated was the "belt" she had used (which was actually a purse strap). Morales was handcuffed and transported to the police station, where she was Mirandized for the first time at 8:55 p.m., some two hours after the police commenced questioning her in her home.[6]

## II.

Morales contends that when the police questioned her in her apartment, they violated the Fifth Amendment by not giving her *Miranda* warnings and the Interpreter Act by not utilizing a qualified interpreter.[7] The validity of each of these grounds for suppressing Morales's incriminating statements depends on whether she was in "custody" when the police interrogated her. *Miranda* warnings are required only when a suspect being interrogated is in custody, *see Berkemer v. McCarty*, 468 U.S. 420, 434, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("[A] person subjected to *custodial* interrogation is entitled

to the benefit of the procedural safeguards enunciated in *Miranda*") (emphasis added), and the protections of the Interpreter Act similarly apply only when an individual is in custody within the meaning of *Miranda*. *See Castellon v. United States*, 864 A.2d 141, 152 (D.C.2004) ("[T]he definition of custody for *Miranda* purposes is the appropriate standard for determining whether the circumstances are such that an individual's right to a qualified interpreter arises under the [Interpreter] Act.").

An individual is in custody for *Miranda* purposes only where there is "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (internal quotation marks and citation omitted); *see also Berkemer*, 468 U.S. at 440, 104 S.Ct. 3138. Whether the curtailment of freedom rises to that level is to be assessed by reference to "how a reasonable man [or woman] in the suspect's position would have understood his [or her] situation." *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138. The determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). The court is obliged to consider "all of the

5. Morales was charged with one count of simple assault and two counts of possession of a prohibited weapon (a belt and an umbrella, respectively). The government dismissed the latter two counts on the day of trial.

6. It appears that the police did not interrogate Morales further after they brought her to the police station and she read a printed Spanish-language card listing her *Miranda* rights.

7. The Interpreters for Hearing–Impaired and Non–English Speaking Persons Act of 1987 requires the police to procure "qualified interpreters" for the custodial interrogation of "communication-impaired" persons and prohibits the use of statements obtained from such persons in violation of this requirement. *See* D.C.Code § 2–1902(e). It is undisputed that Officer Marcucci was not a "qualified interpreter" as defined by the Act. *See* D.C.Code § 2–1901(5).

circumstances surrounding the interrogation" in reaching its conclusion. *Id.* at 322, 114 S.Ct. 1526.

■■■ Whether the evidence establishes that Morales was in "custody" is a question of law as to which our review is *de novo. See Castellon,* 864 A.2d at 152 (citation omitted); *Resper v. United States,* 793 A.2d 450, 456 (D.C.2002). In answering that question, we are obliged to view the record in the light most favorable to sustaining the trial court's ruling; given the absence in the record of "express findings" of fact by the trial court, this means that we must "determine if the denial of the motion to suppress is supportable under any reasonable view of the evidence." *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc) (quoting *Brooks v. United States,* 367 A.2d 1297, 1304 (D.C. 1976)).

■■■ Morales does not contend that she was under formal arrest when she made her inculpatory statements, but she argues that the police restrained her freedom to a comparable extent. Our examination of the circumstances persuades us otherwise. We are convinced that Morales was not in "custody" within the meaning of *Miranda* when the police questioned her at her home.

Certainly the setting was non-custodial. Morales was questioned not in the isolated confines of a police interrogation room, but in the familiar surroundings of her own home with members of her family close at hand. *See, e.g., In re E.A.H.,* 612 A.2d 836, 838–39 (D.C.1992); *McIlwain v. United States,* 568 A.2d 470, 473 (D.C.1989); *see also Castellon,* 864 A.2d at 154. Morales was not caught by surprise by the police visit, nor was she subjected to an unwelcome intrusion. Rather, she knew in advance that the officers were coming, she was "grateful" to them for bringing her son home, and she invited them in. Fur-

thermore, Morales's interview with the police was comparatively brief. The officers questioned her for about half an hour before they placed her under arrest—longer, it is true, than the three-minute interview in *E.A.H., see* 612 A.2d at 837, but much shorter than the four-and-one-half hour interrogations we held not to be custodial in *Morris v. United States,* 728 A.2d 1210, 1213–14 (D.C.1999), and *Johnson v. United States,* 616 A.2d 1216, 1230 (D.C.1992).

During the questioning, the police asked Morales several times whether she had hit her son with an umbrella. No doubt this insistent questioning conveyed to Morales that the police did not believe her repeated denials. But if the interrogation was at times repetitive, it was neither menacing nor belligerent. Absent these qualities, it was not so intense as to contribute materially to an atmosphere of coercion and custody. *Compare United States v. Gayden,* 492 A.2d 868, 873 (D.C.1985) (finding custody where teams of police accused the defendant of lying and interrogated him in a hostile and confrontational manner for five hours "in such a manner as to imply that Gayden's situation had changed so significantly that he was no longer free to go"), *with Morris,* 728 A.2d at 1213–17 (finding no custody where the interrogation was not especially protracted or antagonistic, even though the officers "repeatedly contradicted" the defendant and "confronted him in an accusatory manner"). Furthermore, although the police did not tell Morales that she was free to terminate the interview, they did not threaten her with arrest or tell her that she had no choice but to cooperate with them. Morales was not handcuffed or otherwise physically restrained. No weapons were brandished. *Cf. United States v. Little,* 851 A.2d 1280, 1284 (D.C.2004) (fact that detectives "presented a gun for [defendant] to view" contributed to a finding

of custody). The evidence does not demonstrate that the police created an atmosphere of compulsion.

Morales argues that her limited ability to understand and speak English made the questioning more intimidating. But even assuming that a language barrier is an objective circumstance that could heighten a suspect's sense that her freedom has been curtailed, there is no evidence that such a thing happened here. Morales was able to speak fluently in Spanish with Officer Marcucci, and she does not claim that his translations were deficient or confusing. To the contrary, Morales testified that Officer Marcucci "speaks Spanish very well" and that she "[was] able to understand everything he said." Nor does Morales claim that she could not make herself understood.

■ Morales emphasizes that the police did more than just question her in her home. They restricted her freedom of movement when they prevented her from going to get her son, whether by physically blocking her from leaving the room, as Morales claims, or via a non-threatening verbal directive, as Officer Marcucci testified. But though this may have been a seizure within the meaning of the Fourth Amendment, " 'seizure' and 'custody' are not synonymous." *United States v. Turner*, 761 A.2d 845, 851 (D.C.2000). "Under *Berkemer*, the question [in a custody inquiry] is *not* whether a reasonable person would believe he was not free to leave, [but] rather whether such a person would believe he was in police custody of the degree associated with formal arrest." 2 WAYNE R. LAFAVE, CRIMINAL PROCEDURE 526 (2d ed.1999). In *Castellon*, for instance, we held that the defendant was not in custody even though he "may have been seized within the meaning of the Fourth Amendment" when the police "prohibited Castellon from returning to his

bedroom and restricted him to the living room/dining room areas before they obtained his consent to search the bedroom." *Castellon*, at 153. In *E.A.H.*, the respondent "was obviously 'seized' and not free to leave" when he was detained in his living room while police searched his house and then was called to another room to be interviewed by a detective. *E.A.H.*, 612 A.2d at 837. Nevertheless, we held that the respondent was not in custody because "the restraint on [his] liberty ... did not approach a level comparable to that of formal arrest." *Id.* at 839; *see also McIlwain*, 568 A.2d at 473. Here, when the police officers told Morales that she could not go to her son until they finished questioning her, they made it clear that they were imposing only a temporary and limited restraint on her freedom of movement. This limited restraint may have been a Fourth Amendment seizure, but by itself it does not establish that Morales was in custody.

■ It might be suggested that, as a recent, non-English-speaking immigrant of limited means and resources, Morales was at a pronounced cultural and socioeconomic disadvantage in her encounter with the police, a disadvantage that may have increased her anxiety and submissiveness. But in evaluating whether Morales was in custody for *Miranda* purposes, consideration of such inherently subjective and individualized factors is impermissible. "The *Miranda* custody inquiry is an objective test." *Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140, 2151, 158 L.Ed.2d 938 (2004) (holding, *inter alia*, that a suspect's prior history with law enforcement is a subjective factor that must be disregarded in determining whether suspect was in custody). Limiting the focus to the objective circumstances of the interrogation "ensur[es] that the police do not need 'to make guesses as to [the circumstances]

at issue before deciding how they may interrogate the suspect.'" *Id.* (quoting *Berkemer,* 468 U.S. at 431, 104 S.Ct. 3138). The police are not charged with "the burden of anticipating the frailties or idiosyncrasies of every person whom they question." *People v. P.,* 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255, 260 (1967) (quoted favorably in *Berkemer,* 468 U.S. at 441, 104 S.Ct. 3138). We therefore may not, and do not, consider Morales's background in reaching our conclusion.

Taking all the foregoing circumstances into consideration, and mindful of past cases holding comparable and more intimidating confrontations to be non-custodial, we cannot conclude as a matter of law that Morales was in custody when the police interrogated her, i.e., that her freedom of action was curtailed to a degree associated with a formal arrest. We therefore uphold the trial court's denial of her motion to suppress her statements.

Accordingly, we hereby affirm Morales's conviction for simple assault.