**In re D.W., Appellant.**

No. 06–FS–312.

District of Columbia Court of Appeals.

Argued June 29, 2009.
Decided Feb. 18, 2010.

Kyle A. McGonigal, Washington, appointed by the court, for appellant.

Sidney R. Bixler, Assistant Attorney General, Office of the Solicitor General, with whom Peter J. Nickles, Acting Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for the District of Columbia.

Before FISHER and THOMPSON, Associate Judges, and SCHWELB, Senior Judge.

THOMPSON, Associate Judge:

After a bench trial in the Superior Court Juvenile Division, the court found appellant D.W. responsible for one count of kidnaping, one count of attempted first-degree child sexual abuse, and two counts of second-degree child sexual abuse. In this appeal, D.W. contends that the court erred in denying his motion to suppress statements that he made to police. He also argues that (1) the petition was insufficiently specific as to the kidnaping charge; (2) merger applies with respect to the kidnaping and child sexual abuse adju-

dications that were based on a June 2005 incident; (3) the court erred in permitting an amendment to the petition as to one of the charges of second-degree child sexual abuse; and (4) the evidence was insufficient to support the court's finding that he committed attempted first-degree child sexual abuse. We affirm the judgment of the trial court.

I.

The court reserved ruling on D.W.'s suppression motion until hearing all the evidence at trial. The evidence was as follows. The complainant, R.T., testified about two incidents involving D.W., whom she described as her godbrother and who lived in a house along with R.T., her mother, and her two brothers. The first incident occurred during the summer of 2003, when R.T. was nine years old and D.W. was fifteen. R.T. was alone in her family's living room when D.W. "came over and touched [her] . . . on [her] breast."

The second incident occurred on June 21, 2005, when R.T. was eleven. R.T. was in her mother's room getting a DVD when D.W. entered, grabbed her arm and then her wrist, pulled her, told her to go into her own bedroom, and when she refused, pushed her into her room, which was ten to fifteen feet away. D.W. then "pulled [R.T] on[to] the floor and got on top of [her]," took off his shoes and shirt, and "tried to unbutton [R.T's] . . . pants," scratching her stomach in the process. D.W. did not manage to get R.T.'s clothes off, but he "put his hands under [R.T.'s] butt" and "squeez[ed][her] butt" while he was on top of her with his knees on the ground. R.T. testified that the encounter ended moments later when Terry Quales, a friend of R.T.'s mother, came upstairs. D.W. jumped off of R.T. and sat on the bed. Quales said "that is wrong, what you all are doing," and "it smells like sex in

your room." R.T. then told Quales what had happened. She also called her parents, and when her father arrived at the house, she told him that "D. was touching [her]."

R.T.'s father, E.T., testified that he went to the house in response to R.T.'s call. He called D.W. downstairs and asked him whether he had "put his hands on" and "sexually harass[ed]" his daughter. D.W. said that he did. E.T. instructed R.T. to call the police.

Metropolitan Police Department ("MPD") Officer Edward Farris testified that, at about 5:00 p.m., he and his partner Officer Creasman, both armed and in uniform, responded to the report of a "criminal assault" (which the officer explained is a code phrase for "sexual assault"). When they arrived on the scene, Officer Farris found R.T. and D.W. both seated in the living room, with no one else apparently in the house. Farris "separated the female and the male" and said to D.W., "[L]et's go upstairs." Officer Creasman remained downstairs and, Officer Farris believed, questioned R.T. D.W. and Officer Farris went to an unoccupied upstairs bedroom and D.W. sat down on the bed. The door to the bedroom remained open. Standing at a distance of four to five feet from the bed, the officer asked D.W. in a conversational tone, "[W]hat's going on[?]" Farris explained that he was not aware of what had actually happened at that point,[1] and by his question, was "[j]ust [trying to] determine if [he] had anything at all, any event." D.W. replied, "I'm not going to lie, I got on top of her and you know, and then a guy came in and told me to get off

of her." Farris testified that D.W. also said that "she said get off of me." Officer Farris did not inform D.W. that he was not under arrest or that he was free to leave. Asked whether D.W. actually was free to leave at that point, Officer Farris responded, "I probably would say no." After being upstairs for about a minute and a half, Officer Farris and D.W. walked back downstairs and Farris told D.W. to "have a seat on the steps." Farris then called a detective at the MPD's Youth Division and handcuffed D.W.

Detective Keith Bookard of the MPD Youth Division arrived at R.T.'s home at about 6:15 p.m. and was the officer who placed D.W. under arrest and escorted him from there to the Youth Division. The detective testified that, prior to interviewing D.W. at the Youth Division just before 9:00 p.m., he orally advised D.W. of his rights and also provided him with a PD 47 form, which explained those rights in written form. D.W. "acted like he understood his rights." In response to questions from the detective, D.W. denied having been drinking or smoking or having "had some sort of blackout."[2] D.W. signed the PD 47 form in several places to indicate that he read (or had read to him) his rights, understood his rights, and wished to answer questions without an attorney present. Thereafter (according to the transcript of the interview submitted to the court with the government's July 8, 2009 Rule 28(k) letter), D.W. told the detective that he "touched the eleven-y[ea]r-old" "around the waist," that she "told me to get off and then . . . I touched her again and then a

---

1. Farris explained that "upon arriving on any scene or any situation, you have to establish that something had occurred. A lot of times the radio runs are misclassified, so you have to see what's going on."

2. Bookard inquired into these issues "to make sure that [D.W.] knew what he was saying." The detective testified that he did not know "whether or not D.W. had any sort of learning disability." He also testified that D.W. sat in the police squad car for some time before being taken to the police station.

man came down," that "he had shorts and socks on but had taken off his shirt," and that "I know I was wrong what I was doing." A video recording of Detective Bookard's interview with D.W. was played for the court.

After hearing all the testimony, the court denied D.W.'s motion to suppress the statements he made to Officer Farris and Detective Bookard. The court credited Officer Farris's testimony and found that the questioning of D.W. by Officer Farris was not custodial and was of a "general investigative nature and ... not posed to elicit an incriminating response." The court also found that D.W.'s statement to Detective Bookard was not coerced. The court credited R.T.'s testimony and found that it was corroborated by the testimony of E.T. and Officer Farris that D.W. admitted "sexually harass[ing]" or getting on top of R.T., and by D.W.'s statement to Detective Bookard.

## II.

■ D.W. contends that the court should have suppressed his statements to Officer Farris because they were made without the officer having advised D.W. of his *Miranda* rights. He also argues that his statements during the interview with Detective Bookard should also have been suppressed because the purported waiver ·of his *Miranda* rights was not voluntary, an argument D.W. raises for the first time on appeal, and because police engaged in the type of two-step interrogation prohibited under the Supreme Court's ruling in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

■ The rights established under *Miranda* are triggered only when an individual is in custody and under interrogation. *Miranda v. Arizona,* 384 U.S. 436, 445, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (recognizing that safeguards are required

in the case of "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights"). In determining whether an individual is in custody, a necessary inquiry is whether, given the circumstances surrounding a police encounter, "a reasonable person [would] have felt he or she was not at liberty to terminate the [encounter] and leave." *In re I.J.,* 906 A.2d 249, 256 (D.C.2006) (quoting *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)) The inquiry is an objective one, i.e., "how a reasonable person in the suspect's situation would perceive [the] circumstances." *Moore v. United States,* 927 A.2d 1040, 1059 (D.C. 2007) (citation omitted); *Morales v. United States,* 866 A.2d 67, 73 (D.C.2005) ( [C]onsideration of ... "inherently subjective and individualized factors is impermissible."). However, "this inquiry, though necessary, is not sufficient." *In re I.J.,* 906 A.2d at 256. "[T]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (citation and internal quotation marks omitted); *In re J.H.,* 928 A.2d 643, 648 (D.C.2007) (per curiam); *see also United States v. Newton,* 369 F.3d 659, 672 (2d Cir.2004) (noting that "a free-to-leave inquiry reveals only whether the person questioned was seized" and is not dispositive as to whether the person was in custody for *Miranda* purposes).

■ "[T]he first step in the inquiry" [about "custody"] is to determine what were "the circumstances surrounding the interrogation"—a "distinctly factual" inquiry as to which "we must defer to the trial judge's factual findings and accept any reasonable inferences [she] has drawn

from the evidence." *In re J.H.*, 928 A.2d at 650–51. The issue of "whether on the duly established facts, appellant was subject to custodial interrogation without the benefit of *Miranda* warnings" is a legal one, which we review *de novo*. *Hill v. United States*, 858 A.2d 435, 442 (D.C. 2004).

■ As the Supreme Court has observed, "[u]nfortunately, the task of defining 'custody' is a slippery one." *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *see also Berkemer v. McCarty*, 468 U.S. 420, 441, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (recognizing that police and the courts "will continue occasionally to have difficulty deciding exactly when a suspect has been taken into custody"). It is clear, however, that an individual may be in custody even when he has not been formally arrested [3] and may be in custody even while remaining in his own home. *See, e.g., Orozco v. Texas*, 394 U.S. 324, 326–27, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (suspect questioned in his bedroom was in custody). However, the fact that police have already identified an individual as a suspect does not mean that their interview of the individual is custodial. *Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517. In addition, as the Supreme Court explained in *Oregon v. Mathiason*, a situation "is not converted to one in which *Miranda* applies simply because . . . the questioning took place in a coercive environment." 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam) ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the

suspect to be charged with a crime."). Nor is the fact that the police officer intends to arrest an individual dispositive of whether the individual is in custody. *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time.").

D.W. cites a number of facts that he contends require a conclusion that he was in custody when Officer Farris interviewed him. He emphasizes that the officer questioned him in "a room upstairs away from anyone else's view" and that it was "abundantly clear to Officer Farris from [the] circumstances that D.W. was the alleged perpetrator of the assault." Further, the officer, who was armed, remained standing while D.W. was seated on the bed, an act which a reasonable person could perceive as a "show of authority." *Moore*, 927 A.2d at 1060. Although the officer did not inform D.W. that he was being arrested, the officer also did not clarify that D.W. was free to leave. *See In re J.H.*, 928 A.2d at 650 ("It certainly is a relevant, and important, part of the totality of the circumstances if the person being interviewed was told that he did not have to talk with the police officer and was, in fact, free to leave."); *In re I.J.*, 906 A.2d at 260 ("[W]here the police specifically inform the suspect that she or he is not under arrest, and does not need to talk to the police, a stop for investigatory purposes is unlikely to be custodial even if some form of restraint is imposed.") (citation omitted).

On this record, however, "[t]aking all the foregoing circumstances into consideration, and mindful of past cases holding comparable and more intimidating confrontations to be non-custodial, we cannot conclude as

---

**3.** *See In re I.J.*, 906 A.2d at 264 (explaining that custody may exist where police question a suspect "in a private [room] away from public view"); *see also United States v. Turner*, 761 A.2d 845, 852 (D.C.2000) ("[W]hat most concerns the court is police dominated questioning that is away from the public view").

a matter of law that [D.W.] was in custody when the police interrogated [him], i.e., that [his] freedom of action was curtailed to a degree associated with a formal arrest." *Morales,* 866 A.2d at 74. This case is similar to *In re E.A.H.,* 612 A.2d 836 (D.C.1992). In that case, a divided panel of this court held that E.A.H. was not in custody for *Miranda* purposes even though the facts showed that several uniformed and armed officers executing a search warrant at the home in which E.A.H. lived with his mother and his siblings placed all of the occupants of the house in the living room on the ground floor, guarded all of the exits, and recovered a pistol in one of the bedrooms; that an officer, who interviewed E.A.H. and his half-brother one at a time in the bedroom with the door open, showed E.A.H. the search warrant, explained that he was looking for the weapon involved in a shooting, and asked him if the pistol that police had just found was used to shoot the victim; and that E.A.H., after initially responding in the negative, stated in response to further questions that the pistol was his and that he was the person who had shot the victim. *Id.* at 837, 839. We concluded that "even taking into consideration E.A.H.'s youth, the restraint on E.A.H.'s liberty during his brief questioning in a room in his home with the door open did not approach a level comparable to that of a formal arrest" because "[n]o weapons were drawn" and "E.A.H. was not handcuffed." *Id.* at 839. It is true that here, unlike in *E.A.H.* and *Morales,* the facts do not show that D.W. enjoyed the (presumably) protective presence of family members in the house while he was being questioned, but D.W. nevertheless was in "familiar surroundings." *Morales,* 866 A.2d at 72. In addition, the officer asked D.W. to accompany him upstairs rather than forcibly leading him there,[4] nothing in the record indicates that Officer Farris drew his weapon or directed D.W. to one location rather than another on the second floor, the bedroom door remained open, the officer spoke to D.W. in a conversational tone without accusing him or indicating that he already knew D.W. was guilty of something, and the location was not dominated by police or by accusers (other than R.T.).[5] Moreover, "[o]nly a short period of time elapsed" between the time Officer Farris had D.W. accompany him to the upstairs bedroom and asked "what's going on?" and the time when the two rejoined the others downstairs and the officer directed D.W. to have a seat on the steps. *Berkemer,* 468 U.S. at 441, 104 S.Ct. 3138. And "[a]t no point during that interval was [D.W.] informed that his detention would not be temporary." *Id.* at 441–42, 104 S.Ct. 3138. Because we conclude for these reasons that D.W. was not in custody when Officer Farris questioned him, we also hold that the trial judge did not err in denying D.W.'s motion to suppress his statements to the officer.[6]

■■■ We hold the same as to D.W.'s statements to Detective Bookard after the detective read him his rights and he signed the PD 47 form waiving his right to remain

---

4. *Cf. United States v. Mittel–Carey,* 493 F.3d 36, 40 (1st Cir.2007) (explaining that the "level of physical control that the agents exercised over the defendant" carries the most weight in the determination of whether defendant was in custody).

5. *Cf. United States v. Griffin,* 922 F.2d 1343, 1354–55 (8th Cir.1990) ("[T]he setting of the interrogation is not so important to the inqui-

ry as the question of police domination of that setting.").

6. Because we conclude that D.W. was not in custody so as to trigger *Miranda* requirements, we need not resolve whether Officer Farris's question, "what's going on?," constituted "interrogation."

silent and to counsel during the interview. Post-*Miranda*-warning admissions are admissible where the government satisfies its burden of proving, by a preponderance of evidence, that the accused "knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." *In re M.A.C.*, 761 A.2d 32, 36 (D.C.2000) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)). A trial court must determine the validity of a waiver of *Miranda* rights in light of the totality of the circumstances, including, in the case of a juvenile, the juvenile's "age, experience, education, background and intelligence, the circumstances under which the statement was given, and whether the juvenile 'has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.'" *Id.* (quoting *Fare*, 442 U.S. at 725, 99 S.Ct. 2560). If the record contains "substantial evidence . . . to support the trial court's factual findings of a knowing, voluntary, and intelligent waiver of *Miranda* rights, we will uphold them." *Id.* at 38 (citations omitted).

D.W. argues that the trial court did not adequately consider the validity of his waiver of *Miranda* rights, because the court said nothing on the record to indicate that it had given special consideration to D.W.'s age, his possible learning disability,[7] his lack of experience in the criminal justice system, and his deprivation of family support while he was being questioned. We conclude, however, taking our decision in *M.A.C.* as a guide, that substantial evidence supports the trial court's factual finding that D.W. gave a valid waiver of his *Miranda* rights.[8] M.A.C., a fifteen-year-old who was "mildly mentally retarded," was arrested and taken to the police station at about 11:15 p.m. and remained there until he signed a statement at about 3:40 a.m. *In re M.A.C.*, 761 A.2d at 35. The trial court found that the detective who interviewed M.A.C. had informed him of his rights "slowly and clearly after ascertaining . . . that he could not read;" that although M.A.C. was in handcuffs chained to the floor, he was restrained "in a manner that did not place him in an uncomfortable position;" that the detective never yelled at M.A.C.; that M.A.C. appeared to understand his rights and did not appear to be fearful or fatigued; that M.A.C. had numerous prior experiences with the legal system; and the detective had not used

7. No evidence was presented about D.W. having a learning disability. While D.W.'s counsel told the court during a preliminary hearing that D.W. was a "special education student in an ungraded curriculum and functions on the third grade level," his former guardian (R.T.'s mother) told the court at the disposition hearing that D.W. was "very intelligent," "understand[s] clearly," "know[s] what he's doing," and is "fooling y'all," and implied that he is streetwise.

8. We have held, in the Fourth Amendment context, that a trial court has a "duty . . . to deal *expressly* and thoroughly with the significance of age before finding that a juvenile has [waived his rights and] consented to a search." *In re J.M.*, 619 A.2d 497, 504 (D.C. 1992) (en banc) (emphasis added). We concluded in *J.M.* that because the trial court had failed to make mention of "the effect of appellant's age and maturity (or lack thereof) on his ability to consent voluntarily" to a patdown, a remand for explicit consideration of the issue was required, and that it was not enough that the "experienced trial judge in th[e] case . . . [was] aware J.M. was under fifteen at the time of the search." *Id.* at 502, 503, 504. We reasoned that explicit "findings . . . are particularly necessary when it is conceded, as in this case, that the youth was not told he could withhold consent," advice that is " 'highly relevant' to the voluntariness issue." *Id.* at 503. But we have not required such explicit findings in the Fifth Amendment context in which police advise a juvenile of his right to remain silent.

"coercive tactics, trickery or deception to obtain the statement." *Id.* at 38. We concluded that this was "substantial evidence to support the trial court's factual findings that M.A.C. knowingly and intelligently waived his *Miranda* rights," in spite of the facts that M.A.C. had been handcuffed, held for hours, and had a low I.Q. *Id.* at 38, 39 ("A low I.Q., standing alone, will not render an otherwise voluntary and knowing confession inadmissible."). We noted in particular that M.A.C. was "questioned by a single detective who took care to explain his rights more than once and to ensure that he understood them." *Id.* at 39; *see also Fare,* 442 U.S. at 726–27, 99 S.Ct. 2560 (reasoning that the juvenile voluntarily and knowingly waived his Fifth Amendment rights where juvenile court found that police read and explained the rights to the juvenile and "ascertained that [he] understood those rights," where "no special factors indicate that respondent was unable to understand the nature of his actions," and he "was not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit").

In this case, the court explicitly mentioned or relied on evidence that established similar facts (or facts indicative of even less coercive potential). The court credited Detective Bookard's testimony that the detective read D.W. his rights "four hours after the initial call [at R.T.'s house] but as soon as the officer came to be seated in the room with the respondent," that D.W. read the rights as set out on the PD 47 form and said he understood his rights, and that there was "very brief questioning of a conversational tone" (an observation the court presumably made from viewing the video recording, since

Detective Bookard did not testify about the tone of voice that he used). Detective Bookard testified that D.W. appeared to understand his rights, and, from the video recording of the interview, the court presumably could assess the clarity of the detective's reading to D.W., D.W.'s demeanor, energy level and apparent level of understanding. Also, the court could hear the statements the detective made and questions he asked of D.W. and could see the lack of restraints. Although in ruling on the motion to suppress the court did not explicitly discuss D.W.'s age and it doubtless would have been better practice for the court to do so, the record shows that the court was aware of D.W.'s age (the court noted his age explicitly when it rendered its findings on the merits, the lawyers referred to D.W.'s age repeatedly in their briefs and arguments on the motion to suppress, and the court began its findings by stating that it "had the benefit" of the briefs). Especially in light of the court's opportunity to view the video recording, we discern no basis to disturb the court's conclusion that D.W. gave a valid waiver of his *Miranda* rights. *Cf. Everetts v. United States,* 627 A.2d 981, 986 (D.C.1993) (noting that trial court's viewing of the video of appellant's statement to police supported the court's finding that waiver of rights was knowing, intelligent, and voluntary). Accordingly, there was no error in admitting D.W.'s statements to Detective Bookard.

We can dispose quickly of D.W.'s claim that his statements to the police were inadmissible under *Seibert.*[9] The ruling in *Seibert* prohibits police departments from employing "question-first" strategies, by which officers, during a custodial interrogation, deliberately "question first, then

9. D.W. argues that he "undoubtedly felt compelled to make the subsequent statement [to Detective Bookard] at the station later that same day as he had let the 'cat out of the bag' regarding his involvement in the offense."

give the [*Miranda*] warnings, and then repeat the question until [they] get the answer that [the suspect] already provided once." *Edwards v. United States*, 923 A.2d 840, 845 (D.C.2007) (internal quotation marks omitted) (quoting *Seibert*, 542 U.S. at 606, 124 S.Ct. 2601). The Court has characterized this technique as a "police strategy adapted to undermine ... *Miranda* warnings." *Seibert*, 542 U.S. at 616, 124 S.Ct. 2601.[10] But a *Seibert* violation cannot occur unless the first interrogation was conducted in violation of *Miranda*, i.e., while the defendant was in custody without having been advised of his *Miranda* rights. *See United States v. Thompson*, 496 F.3d 807, 811 (7th Cir. 2007) (In *Seibert*, "the Supreme Court invalidated the 'question first' police protocol for custodial interrogation in which the police first question a suspect *who is in custody* until the suspect gives a confession without giving the suspect *Miranda* warnings.") (emphasis added). Our holding *supra*, that D.W. was not in custody during the first questioning, is fatal to the *Seibert* claim. *See, e.g., Thompson*, 496 F.3d at 811 ("In light of our finding that Thompson was not 'in custody' during the first interview, his second challenge, the contention that his September 23, 2004 confession was the result of an impermissible, two-step interrogation process designed to circumvent and undermine *Miranda*, also fails."); *United States v. Brown*, 441 F.3d 1330, 1349 (11th Cir.2006) ("Accordingly, we conclude that Brown was not in custody when he first confessed to robbing and murdering Gaglia, he was not entitled to *Miranda* warnings, and the

statements need not be suppressed. Moreover, because Brown's *Seibert* arguments, which are related to the second and third confessions, are wholly dependent upon the suppression of the first, we conclude that all of the statements were legally obtained.").

### III.

■■■ D.W. next contends that the charging document was insufficient as to the kidnaping charge, because it "failed to include the essential facts regarding the purpose" for the commission of the crime and "particular facts about the manner in which the seizure occurred[.]" The petition charged that D.W. "[o]n or about June 21, 2005, ... intentionally seized, confined, abducted, or carried away, R.T., against her will and held and detained R.T. for ransom, reward, *or other purpose*" in violation of D.C.Code § 22–2001 (2001) (italics added). D.W. relies on *Horowitz v. District of Columbia*, in which, in light of the particular offense charged, we held insufficient a charging document that "charged the offense in the wording of the statute, without any particulars as to the acts by which the offense was committed." 291 A.2d 202, 203 (D.C.1972) (explaining that a charging document "should sufficiently apprise the accused of the charge against him so he may properly prepare his defense"). However, as we also recognized in *Horowitz*, "some offenses by their very nature may be adequately described in the words of the statute." *Id.* D.C.Code § 22–

10. In *Seibert*, the arresting officer followed Officer Hanrahan's instructions that the arresting officer refrain from giving Seibert *Miranda* warnings when she was taken to the police station for questioning. Hanrahan thereafter questioned Seibert for thirty to forty minutes until she made a critical admission about intending to kill victim Donald, and only then did Hanrahan turn on a tape recorder, give Seibert the *Miranda* warnings and obtain a waiver of rights, and confront her with her pre-warning statements by saying, "Now, in discussion you told us ... that there was a[n] understanding about Donald." *Seibert*, 542 U.S. at 604–05, 124 S.Ct. 2601.

2001 describes such offenses.[11] Moreover, the other counts of the charging document relating to events on or about June 21, 2005 alleged a factual context sufficient to apprise D.W. of what conduct the June 21, 2005 kidnaping count covered, to enable him to prepare a defense, and to avoid any future charge based on the same conduct. We are also satisfied here that the juvenile petition's failure to identify a specific motive for D.W.'s acts could not have impeded the defense's preparation, because a "specification of the particular purpose for a kidnapping carries no 'legal significance.' " *Erskines v. United States*, 696 A.2d 1077, 1079 n. 2 (D.C.1997) (citing that basis for upholding a conviction where evidence at trial showed that purpose of kidnaping was different from purpose alleged in grand jury indictment); *Walker v. United States*, 617 A.2d 525, 527 (D.C.1992) ("The motive behind a kidnaping is unimportant, so long as the act was done with the expectation of benefit to the transgressor.") (citation and quotation marks omitted).[12]

## IV.

■ D.W. further contends, with respect to the alleged events of June 21, 2005, that the trial court could not lawfully find him responsible for both kidnaping and child sexual abuse (either attempted first-degree child sexual abuse or second-degree child sexual abuse), because the testimony showed that "the detention or confinement" was "momentary and coextensive in time and place with the underlying crime" and "an integral element of that crime." He argues that the finding that he was responsible for kidnaping should merge with the finding that he committed child sexual abuse.

D.W.'s argument rests on our rulings in *Sinclair v. United States*, 388 A.2d 1201 (D.C.1978) and *Robinson v. United States*, 501 A.2d 1273 (D.C.1985) (per curiam), but those opinions have been superseded by our more recent decisions in *Byrd v. United States*, 598 A.2d 386 (D.C.1991) (en banc) and *Parker v. United States*, 692 A.2d 913 (D.C.1997).[13] Under *Byrd*, where each offense as defined by statute "requires proof of a fact which the other does not," we presume that two offenses arising out of the same act or transaction do not merge, such that an accused may be convicted of both, notwithstanding the constitutional prohibition against "double jeopardy." *Byrd*, 598 A.2d at 389 (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)).

**11.** Section 22–2001 criminalizes "seizing, confining, inveigling, enticing, decoying, kidnapping, abducting, concealing, or carrying away any individual by any means whatsoever, and holding or detaining, or with the intent to hold or detain, such individual for ransom or reward or otherwise." D.C.Code § 22–2001. The government argued and presented evidence that D.W. committed an act described by section 22–2001 against R.T. in that he "forceably [sic] took . . . the victim . . . out of the mother's room by force. . . ."

**12.** Section 22–2001, referring to the concealing or carrying away of a person "for ransom or reward *or otherwise*," makes clear that an alleged kidnaper's particular purpose is irrelevant to his guilt or innocence.

D.W. also argues that no purpose or expectation of benefit was shown for the alleged kidnaping, arguing that forcing R.T. from her mother's bedroom into her own bedroom "did not make it any more likely that D.W. would not be apprehended[.]" But the court could reasonably infer that D.W. acted in an effort to avoid being seen by others who might enter the house.

**13.** *See Bryant v. United States*, 859 A.2d 1093, 1108 (D.C.2004) ("[T]he fact-based merger analysis of *Robinson* has been superseded by our en banc opinion in *Byrd*.") (internal quotation marks and citations removed).

Such a presumption can be overcome only by "a clear indication of contrary legislative intent." *Parker*, 692 A.2d at 916 (quoting *Missouri v. Hunter*, 459 U.S. 359, 366, 367, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983)) (emphasis omitted). We concluded in *Parker* that "[t]he reasoning of *Robinson* and *Sinclair*," which required merger where the "evidence presented at a particular trial" showed that one offense was coextensive with another, "does not suffice to overcome the presumption." *Id.*

*Byrd's* presumption applies here because kidnaping and child sexual abuse each "requires proof of a fact which the other does not." 598 A.2d at 389. Kidnaping, unlike child sexual abuse, requires "asportation or confinement." *Parker*, 692 A.2d at 916; *see also* D.C.Code § 22–2001. Child sexual abuse, on the other hand, requires proof of an actual or attempted "sexual act" (in the case of first-degree child sexual abuse, *see* D.C.Code §§ 22–3008, 3018) or "sexual contact" (in the case of second-degree child sexual abuse, *see* D.C.Code §§ 22–3009, 3018), whereas kidnaping does not. *See also Bryant*, 859 A.2d at 1108 (holding that, under *Byrd*, kidnaping and sexual-abuse convictions do not merge). Since D.W. "has not presented any evidence, much less 'a clear indication of ... legislative intent'" to merge kidnaping with first or second-degree child sexual abuse, his merger argument fails. *Malloy v. United States*, 797 A.2d 687, 691 (D.C.2002).

## V.

■ D.W. challenges the delinquency finding as to the 2003 incident on the ground that it resulted from the improper amendment of the petition. As D.W. notes, the petition originally alleged that in 2003, D.W. "engag[ed] in sexual contact" with R.T., in violation of D.C.Code § 22–3009, by "touching and/or squeezing her buttocks." R.T.'s testimony at trial was that in 2003 D.W. touched her breast but not her buttocks. At the close of the evidence, defense counsel moved "to dismiss [the] count based on the charge being incorrect." The trial court denied the motion and granted the government's motion to amend the petition to replace the word "buttocks" with "breasts." D.W. contends that permitting this amendment was error.

■ However, "the restrictive rules about the amendment of a [grand jury] indictment do not apply" to amendment of an information or similar charging document. *Dyson v. United States*, 485 A.2d 194, 197 (D.C.1984) (per curiam); *see also* Wright et al., *Federal Practice and Procedure* § 129 (2009) (explaining that where a charge is set forth in an criminal information, rather than in an indictment, "the prosecutor is the sole source of the charge" and thus is "free to change it"). Individuals tried as juveniles in the District of Columbia have no right to indictment by a grand jury, and are instead charged by a petition of the Attorney General. *See Catlett v. United States*, 545 A.2d 1202, 1208 (D.C.1988). D.W. therefore is not entitled to reversal unless he can show that he suffered prejudice as a result of the amendment to the petition. *See In re W.K.*, 323 A.2d 442, 445 (D.C. 1974). He has not done so in his brief, and the record does not reveal any "infringement on [his] ability ... to defend the charges." *Pace v. United States*, 705 A.2d 673, 678 (D.C.1998). Correcting the 2003 charge to describe D.W.'s contact with R.T.'s "breasts" instead of her "buttocks" was not "tantamount to charging a new offense," *In re W.K.*, 323 A.2d at 445, because both acts constitute "sexual contact" under the second-degree child sexual

abuse statute.[14] And D.W. does not suggest how his defense—which was that R.T.'s account of D.W. touching her breast was "just not credible" since she did not tell her parents about the incident—would have been different if he had known earlier that the charge was that he touched her breast rather than her buttocks. *See W.K.*, 323 A.2d at 445 (holding that amendment to change the name of the victim listed in juvenile petition was not tantamount to charging a new offense and did not prejudice respondent since his defense was an alibi).

## VI.

Finally, D.W. challenges the sufficiency of evidence underlying his conviction for attempted first-degree child sexual abuse, arguing that "[a]t most, D.W.'s conduct constituted [s]econd degree child sex abuse." When reviewing this claim, we "must view the evidence in the light most favorable to the government, giving full play to the right of the [fact finder] to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *In re E.H.*, 967 A.2d 1270, 1273 (D.C.2009) (citation omitted). Indeed, "it is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt" that we may reverse a conviction on sufficiency grounds. *Id.*

First-degree child sexual abuse is defined by statute, in pertinent part, as "engag[ing] in a sexual act with that child or caus[ing] that child to engage in a sexual act." D.C.Code § 22–3008. A "sexual act" is:

(A) The penetration, however slight, of the anus or vulva of another by a penis;

(B) Contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; or

(C) The penetration, however slight, of the anus or vulva by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

D.C.Code § 22–3001(8) (2001).

The trial court's finding that D.W. attempted first-degree child sexual abuse of R.T. must stand if the evidence was sufficient to establish beyond a reasonable doubt that D.W. committed "an overt act done with the intent to commit [first-degree child sexual abuse], ... which, except for some interference, would have resulted in the commission of the crime." *Davis v. United States*, 873 A.2d 1101, 1107 (D.C. 2005) (citation omitted). We are satisfied that the evidence was sufficient. R.T. testified that D.W. forced her onto her back on the floor, "got on top of [her]," pulled off his shirt and shoes, and then "tried to unbutton [her] pants" and refused to stop when she said, "no." D.W.'s "overt acts"—particularly his efforts to undress himself and her and to get on top of her on the floor—went beyond anything necessary if his intent was merely to make "sexual contact" with R.T. in a manner constituting second-degree child sexual abuse. *See* D.C.Code §§ 22–3009 (defining second-degree child sexual abuse as entailing "sexual contact" with a child) and –3001(9) (defining "sexual contact" 'as "the touching with any clothed or unclothed body part or any object, either directly or through the clothing, of the

14. *See* D.C.Code § 22–3001(9) (2001) (defining "sexual contact" as "the touching with any clothed or unclothed body part or any object, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person").

genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person"). The court could reasonably infer that D.W.'s "overt acts" were done with an intent to penetrate R.T.'s vulva or anus with his hand, finger, or penis. *Cf. Commonwealth v. Pasley,* 743 A.2d 521, 523 (Pa.Super.Ct.1999) (sufficient evidence of intent to engage in sexual intercourse where "[a]ppellant, who was only wearing shorts, threw the victim on his bed, straddled her, pushed up her shirt and bra to her neck, and attempted to unbutton her pants"); *State v. Jackson,* 62 Wash.App. 53, 813 P.2d 156, 159 (1991) (evidence that appellant had convinced complainant to enter bedroom, followed her there, and ordered her to lift her skirt was sufficient to establish intent to have sexual intercourse).[15] Additionally, the testimony that D.W. only got off of R.T. when Quales interrupted him supported an inference that D.W. would have tried to complete

acts constituting first-degree child sexual abuse were it not for the interference. *Cf. Davis,* 873 A.2d at 1107 (appellant would have committed sexual offense had complainant not run away). Thus, we cannot say that there was "no evidence from which a reasonable mind might fairly infer . . . beyond a reasonable doubt" that D.W. attempted to commit first-degree child sexual abuse. *In re E.H.,* 967 A.2d at 1273.

## VII.

For the foregoing reasons, the judgment of the trial court is

*Affirmed.*

---

**15.** And, while there was no explicit testimony on the issue, D.W.'s "intent to obtain illicit sexual gratification could be inferred" from the nature of his conduct. *Davis,* 873 A.2d at 1107.