**Rashaun GEE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 10–CF–1493.**

District of Columbia Court of Appeals.

Argued May 8, 2012.

Decided Oct. 18, 2012.

---

Ivan M. Waldman, Langley Park, MD, for appellant.

Nicholas P. Coleman, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and John P. Mannarino, Sharon Kurn, and Peter Taylor, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY and THOMPSON, Associate Judges, and BELSON, Senior Judge.

THOMPSON, Associate Judge:

A jury found appellant Rashaun Gee guilty of first-degree burglary while armed (knife), assault with intent to kill while armed, aggravated assault while armed, malicious disfigurement while armed, and attempted first-degree sexual abuse while armed, all in connection with an attack on victim Rachel Moretta. In this appeal, appellant contends that he is entitled to reversal of his convictions and a new trial because of "the trial court's error in admitting improper expert testimony, in misapplying the Teoume–Lessane decision[1] to the facts of this case, and for improperly precluding the use and admission" of a 2009 report by the National Research Council of the National Academies of Science. Appellant contends in addition that the trial court erred in refusing to grant a mistrial or other sanction after the government belatedly disclosed a detective's notes and a photograph of appellant. He also argues that the evidence was insufficient to support his conviction for first-degree sexual assault. For the reasons that follow, we affirm.

## I.

Moretta was a tenant occupying the basement bedroom of a house located at 548 14th Street, S.E. She shared the home with Carrie Shaffer and Lauren Behr, who occupied second-floor bedrooms. On the evening of October 6, 2008, Shaffer, who had just returned from a trip abroad and was jet-lagged, went to her room and fell into a sound sleep, and Behr left the house to meet with her parents. Moretta went to her basement bedroom and went to sleep. Moretta testified at trial that she was awakened by the sound of a "clanging" noise and dishes rattling in the kitchen sink. Moments later, she saw someone descending the basement steps, and after she said, "Hello," the person ran back up the steps. Thinking the intruder was a robber, Moretta walked into the basement bathroom and called 911 on her cell phone.

Moretta was still on her cell phone when a man armed with a knife appeared in her bathroom. He immediately began stabbing Moretta. Eventually, Moretta was able to push him away and to run into the adjacent laundry room, but she tripped and fell. The assailant caught up with her and continued to stab her. While Moretta was on her hands and knees and attempting to escape, the assailant grabbed her around her stomach and pulled her closer to him. Moretta heard him unzip his pants and state either, "Shut up, bitch" or "Come here, bitch," while he pulled her underwear down, partially exposing her buttocks. Moretta continued to struggle and kick her attacker, and suddenly, "he just left." Leaving a trail of blood, Moretta climbed the basement stairs and eventually exited the house and screamed for help.

Detective Wallace Carmichael testified that when he interviewed Moretta in the hospital on the day of the attack, she told him that her attacker was wearing "a dark hoodie" and light blue jeans. Similarly, Moretta testified at trial that the attacker was wearing "dark clothing," specifically, "a hoodie, like a hooded sweatshirt," and light-colored jeans. Moretta also testified that she looked at her attacker's face for "[a] second maybe, two, not even" and that the hood of his shirt was "over his face," "deep enough to where you couldn't fully see someone's face, like it would cast a shadow."

1. Teoume–Lessane v. United States, 931 A.2d 478 (D.C.2007).

One of the officers who arrived at the scene was Officer Fred Brown of the Metropolitan Police Department ("MPD") mobile crime forensics unit. Officer Brown testified that the kitchen window (which was above the kitchen sink) was partially open, the screen to that window was "lifted up," a barbeque grill brush was sitting on the window ledge, and an outdoor chair was positioned against the outside wall beneath the window. Inside, several kitchen items were knocked over, some of which had fallen into the sink. Officer Brown recovered fingerprints from the inside bottom of the kitchen window.

Appellant was identified as a suspect when fingerprint analysis revealed that his fingerprints matched those found on the kitchen window.[2] In December 2008 (approximately two months after the stabbing), Detective Carmichael, accompanied by Detective Vandra Turner–Covington, interviewed Moretta in Houston, Texas (where she had returned to live with her parents) and showed her a photographic array containing appellant's photograph. From the photo array, Moretta identified three men (all of whom were "Afro–American") she thought resembled her attacker, but she was unable to make a positive identification from the photo array. Appellant's photograph was not among the photographs that Moretta said resembled her attacker. Moretta testified at trial that her attacker was an African–American man, and Detective Carmichael testified that during the in-hospital interview, Moretta told him that the attacker was a black male. However, as discussed *infra*, there was also evidence that Moretta described her attacker as a person of "Middle Eastern" descent.

Officer Robert Johnson testified that, hours after the incident at 548 14th Street, he searched in the alley adjacent to the house for potential items of evidence and came upon a T-shirt, with what appeared to be small bloodstains on it, lying on top of other items in a recycling can located at the rear of 1403 E Street, S.E.[3] Serological and DNA analysis confirmed that the stains on the shirt were blood and that the blood was Moretta's. DNA analysis of skin cells obtained from a swab of the shirt's neckline showed that the major contributor was appellant. Appellant was arrested after the MPD received the results of the DNA analysis.

The jury began its deliberations on September 16, 2010, and rendered its guilty verdicts the next day.

**II.**

Before trial, the government filed a motion *in limine* in which it asked the court to rule that if the defense engaged in cross-examination that suggested "that the MPD's DNA [or] fingerprint ... testing in this case was flawed" or that "ask[ed] the jury to speculate about untested DNA" or "suggest[ed] ineffective quality assurance procedures or unreliable testing procedures" in the MPD laboratories, the government should be permitted to "rebut the alleged deficiencies" by asking its relevant expert to inform the jury in rebuttal testimony that "the defendant had the right to independently test all items containing biological material and ha[d] an option of independently testing the latent fingerprints." Addressing the motion just before the government called its first witness, the court ruled more narrowly, stating that if the defense sought to

2. A palm print found on the window was also later determined to be that of appellant.

3. Officer Johnson testified that, from the back door of 548 14th Street, it would take "seconds" to reach the location of the recycling can.

show through the testimony of any of its witnesses that the government's analysts had acted in a "biased fashion or acted inappropriately, in terms of its conduct of the scientific tests," this would "open the door" and allow the government an opportunity to counter the implication of biased DNA testing by informing the jury about the defendant's right to test the evidence.

Appellant asserts that, proceeding cautiously in light of the court's ruling, defense counsel "did not ask questions of the [government's] DNA expert that would have directly challenged the expert's actual findings concerning [appellant's] DNA, and instead focused on explaining what testing was actually done on the shirt."[4] To wit, during the cross-examination of forensic biologist Jessica Skillman, defense counsel elicited an acknowledgment that she did not attempt to extract DNA from the shoulders, sleeves, armpits, back, or front of the shirt found in the recycling bin. In a bench conference thereafter, the prosecutor argued that the elicited testimony gave the jury the impression that "had there been testing of those other areas, a different result would have been the outcome" and urged the court to grant the government's motion *in limine*. The trial court agreed that the defense "certainly made it appear that the Government was only testing that which they found a positive test and ignored others that presumably might have been tested and could

have exculpated your client," which was "just unfair." Reasoning that the situation before it "fell squarely within" this court's opinion in *Teoume–Lessane*, the court permitted the government to ask its DNA expert whether the shirt was maintained in a condition such that independent testing could be done (and the expert confirmed that this was the case). The court also took judicial notice and told the jury that "in the District of Columbia[,] the defense does have a right to have items, biological items, independently tested."

Shortly after the court's ruling described in the paragraph above, defense counsel sought an advance ruling about whether, if the defense called its own DNA expert,[5] the government would be permitted to ask the expert "what items did they receive." The prosecutor commented that "the truthful answer would include that [the defense expert] received item number 3, the T-shirt [found in the recycling can]. I don't want [the jury] to think that we're hiding evidence." The court ruled that the government would be permitted to ask the defense expert what items he received for testing, but would not be permitted to ask whether the defense expert actually tested the shirt. The court cited its previous reasoning about not leaving the impression that the government "somehow selectively decided to test [some] items and chose to ignore other items."[6] Not informing the

---

4. Thus, appellant asserts, defense counsel refrained from asking the government's DNA expert about her reading of electropherograms, which appellant contends "showed 'sputter' or peaks at certain points, which through questioning ... would have called into question the actual reading of the samples and DNA match."

5. Defense counsel proffered that the defense DNA expert would testify that he "received 22 items ... from inside of the house. Most of them are blood swabbings. He tested those for the presence of DNA, excluding Mr. Gee.

Two of those swabbings included a mixture of DNA, and neither of those swabbings led to a match of DNA of Mr. Gee." Appellant asserts that this was "highly exculpatory DNA evidence."

6. The court later reiterated that it agreed with the prosecutor that the defense was on notice that "when the defense calls into question the bias of an expert in terms of only examining that which would inculpate a defendant, but not looking at other aspects which would exculpate him, ... the Government is also, to balance that out, without burden shifting, al-

jury of the defense right to test, the court reasoned, "would seem very odd and unusual, almost to a very prejudicial way, that the Government didn't also make available all the items that had DNA on it ... subject to testing." Upon the court's ruling, the defense announced that it had decided not to call its own DNA expert to testify.

During a subsequent discussion focused on cross-examination of the government's fingerprint expert Haywood Bennett, the court ruled: "If you want to say isn't it true, Mr. Bennett, that there are other methods, other than [those used in his] report that are more reliable and are used in the field, he can say yes, he can say no, but you very well may open the door by suggesting that they are using a methodology which is against your client, whereas they could be using other methodologies that might exonerate Mr. Gee. So that's the best I can tell you." [7]

Appellant challenges each of the court's rulings described above. He contends that the trial court misapplied this court's holding in *Teoume–Lessane.* He also argues that the court's rulings "prevent[ed] the defense from properly and lawfully cross-examining the Government's expert witnesses, and from presenting the defense's DNA expert testimony, in a case where the credibility of the complainant and her description of her assailant was conflicting, and when the Government['s] proof was circumstantial." [8] He asserts in addition that the court's informing the jury that the defense had a right to retest the biological evidence improperly shifted the burden of

proof to the defense. We disagree as to each of these points.

In *Teoume–Lessane,* the defense elicited during cross-examination of the government's DNA expert that although nearly thirty items of evidence had been collected during the investigation of the case and sent to the FBI laboratory, and although the MPD requested DNA testing on "all applicable items," some of the items had not been tested for the presence of DNA. 931 A.2d at 491. On redirect, the government "sought leave to ask the analyst whether the defense, as well as the government, had the right to test the items." *Id.* The defense objected that allowing the proposed question would result in shifting the burden of proof to the defense. The trial court granted the government's request, observing that the defense's questions had "attempted to create the impression that the FBI's testing had been selectively performed to skew the results by focusing only on the items most damaging to appellant, while ignoring items that could have helped to exculpate him," and reasoning that "left unaddressed, the ... questions would have tended to indicate that the FBI's testing procedures were biased." *Id.* The prosecutor then asked the analyst, "with regard to the items that were submitted to the DNA Analysis Unit for evaluation ... in the District of Columbia[,] does the defense have the right to have those items also scientifically tested?" *Id.* (internal quotation marks omitted). This court concluded that the trial court did not abuse its discretion by permitting the govern-

---

lowed to seek a judicial notice" about the defense's opportunity to conduct its own testing.

7. The court did not specifically rule on the prosecutor's assertion that any defense inquiry about fingerprint analysis error rates would open the door to informing the jury

about the defense right to test (and this opinion does not address whether the requested ruling would have been improper).

8. Appellant's brief also suggests that he was "forced to not present the testimony" of defense fingerprint expert Vernon McCloud.

ment to ask that one question "to counter the implication that the FBI's approach to testing the evidence in this case was biased." *Id.*[9]

■■■■ As in *Teoume–Lessane,* we perceive no abuse of discretion in the trial court's reasoning that not allowing the jury to learn that the defense had the right to test the shirt and that the shirt was available for testing would have been unduly prejudicial to the government, creating the impression that the government had deliberately ignored, and then had withheld from the defense, evidence that could have called into question the government's DNA-based case. Nor, in light of our holding in *Teoume–Lessane,* can we agree that the trial court's ruling shifted the burden of proof to the defense. We note that defense counsel rejected the trial court's suggestion that the court include in its closing instructions to the jury a statement to the effect that while the court "took judicial notice of [the] rule that permits the defense to independently test ... [,] this does not mean the defendant had any obligation to put on evidence [because] the burden of proof is solely on the Government." But the court did give the standard instruction that the government's burden of proof "never shifts throughout the trial. The law does not require a defendant to prove his innocence

or to produce any evidence at all." Defense counsel, too, in his closing argument, emphasized to the jury that the "burden of proof never shifts to the defendant" and that "I don't have to prove anything. I didn't have to bring in any evidence. It's their burden." And, in the government's closing argument, the prosecutor made no mention of the defense right or opportunity to conduct independent testing. These facts, in addition to the fact that the questioning and information appellant challenges were permitted only in response to defense questioning and only for the purpose of dissipating the prejudicial effect of the questions' implication of incomplete or selective government testing, persuade us that the trial court's evidentiary rulings did not result in impermissible burden-shifting. *Cf. People v. Santana,* 255 P.3d 1126, 1131–32 (Colo. 2011) (noting that when assessing whether the burden of proof has been shifted, "courts mainly consider the degree to which: (1) the prosecutor specifically argued or intended to establish that the defendant carried the burden of proof; (2) the prosecutor's actions constituted a fair response to the questioning and comments of defense counsel; and (3) the jury is informed by counsel and the court about the defendant's presumption of innocence and the prosecution's burden of proof.").[10] (Footnotes omitted).

9. Our holding followed our express recognition that "[a] trial court's decision to admit evidence as more probative than prejudicial may be reversed only for abuse of discretion." *Id.* at 491.

10. *Compare State v. Roman Nose,* 667 N.W.2d 386, 399–400 (Minn.2003) (reasoning that where defense counsel "seem[ed] to challenge the thoroughness and competency of [the government expert's] DNA testing" and questioned him "about samples taken at the crime scene on which DNA testing was not performed," and where the prosecutor was permitted to ask the expert on redirect whether

the defense "could perform retesting on the samples," the trial court "could have concluded that the prosecutor's question was in response to [defendant's] attack on the adequacy of the [State's] DNA testing and not intended to suggest that [defendant] should have conducted his own testing," and therefore concluding that the trial court did not abuse its discretion in allowing the prosecutor's question and that the question "did not impermissibly shift the burden of proof"), *with Hayes v. State,* 660 So.2d 257, 265 (Fla. 1995) (reversing and remanding for a new trial where, among other things, the State was allowed "to inquire whether the defense

Appellant attempts to distinguish *Teoume–Lessane* on two grounds. First, he emphasizes, in *Teoume–Lessane*, the government was permitted to ask a single question about the defendant's right to have items of evidence scientifically tested. Here, by contrast, the jury learned (or would have been permitted to learn, if the defense expert had testified), through a combination of government questioning and judicial notice, both about the defense right to conduct independent testing and about the facts that the bloody shirt was maintained in a condition that allowed for independent testing and that the defense DNA experts had received for testing the same biological material the government experts had analyzed. Second, appellant asserts, in *Teoume–Lessane*, the defense testing was done outside the "statutory protections" and "shield" of the Innocence Protection Act ("IPA") [11] and the Criminal Justice Act ("CJA"),[12] whereas in this case, both statutes are implicated and (assertedly) protect against disclosure of the defense right to test.

We reject the first distinction appellant draws, because the prejudicial effect of questioning suggesting that the government selectively tested evidence is not cured if the jury is informed that the defendant has a right to test but the jury is left to speculate either that the government's experts left no unconsumed material that could be tested,[13] or that the government withheld biological material, failing to honor the defendant's right to conduct independent testing. The questions the trial court permitted reflected a recognition of that reality, and we cannot say that the trial court abused its discretion in ruling that the additional questions in issue here could be allowed if the defense elicited testimony implying selective or incomplete testing by government analysts.

As to appellant's argument about the protection the IPA affords against disclosure of the defense right to test, we agree with the observation made by the trial judge: we see no basis for concluding that the IPA "stands for that proposition." Nothing in the IPA addresses whether disclosure may be made to the jury about the defendant's right to request independent testing or about whether the defense has received biological evidence for testing. Appellant's (undeveloped) CJA argument is an apparent reference to the fact that the motions judge (the Honorable Lynn Leibovitz) signed an order pursuant to the CJA authorizing payment of the costs of defense DNA and fingerprint experts. Neither the CJA nor that order says anything whatsoever about whether the jury may be informed about the defense opportunity to obtain expert testing or about the availability of biological material for testing.[14]

---

had requested any testing of the blood stains" and "[t]he witness replied that the defense had not," and in closing argument the prosecutor made comments "concerning the failure of the defense to test hairs found at the scene of the murder").

**11.** *See* D.C.Code § 22–4132(b)(1) (2001) ("A defendant charged with a crime of violence shall be informed in open court ... [t]hat he or she may request ... independent DNA testing prior to trial....").

**12.** *See* D.C.Code §§ 11–2601 and –2605 (2001) (providing that the plan for furnishing

representation of indigents in criminal cases "shall include ... expert ... services necessary for an adequate defense").

**13.** Indeed, a condition of a defendant's right to request independent DNA testing under § 22–4132 is that "[t]here is sufficient biological material to conduct another DNA test[.]" D.C.Code § 22–4132(b)(1)(B).

**14.** Judge Leibovitz did issue an order "se[tting] forth the procedures that will be used in transmitting and preserving the [biological] evidence to ensure its integrity," in

Turning to appellant's argument that the court's rulings prevented the defense from adequately cross-examining the government's experts, we conclude that the defense proceeded with more caution than the court's rulings necessitated.[15] Notably, when defense counsel cross-examined fingerprint expert Bennett about his overall competence, eyesight, record-keeping, and documentation, and about whether he had followed International Association for Identification ("IAI") methods and Scientific Working Group on Friction Ridge Analysis, Study and Technology ("Scientific Working Group" or "SWGFAST") guidelines, the court rejected the government's argument that the defense had opened the door for a *Teoume–Lessane*-type notice about the defense right to conduct independent testing. We also assume, in light of the defense right to test and opportunity to test, that if the defense had a good faith basis for additional questioning implying that the government's analysts did perform incomplete or invalid testing, defense counsel would have called the defense expert(s) to testify to that view (and thus would not have been restrained in his questioning of the government's experts by the possibility that the jury would learn about the opportunity for defense re-testing).

Appellant contends that he was unable, because of the court's rulings, to call the defense fingerprint and DNA experts to testify that appellant's fingerprints and DNA were not found anywhere in the house (other than prints on the kitchen window), because even that would have triggered the trial court's "read[ing] another judicial notice under *Teoume–Lessane*" and the government's "asking ... questions concerning [the defense experts'] independent testing of evidence."[16] It ap-

which she directed that the results of DNA testing by defense experts were to be provided to the court, to "remain under seal until further Order of this Court." Nothing in the rulings by the trial judge (the Honorable Russell Canan) permitted the government to ask about whether the defense had actually performed DNA testing or about the results of any such testing.

**15.** We have in mind the court's September 8, 2010, ruling about the door possibly opening if defense questioning of the government's analyst witnesses sought to show that the analysts had acted in a "bias[ ]ed fashion or acted inappropriately, in terms of ... conduct of the scientific tests," and its September 15, 2010, ruling that "when the defense calls into question the bias of an expert in terms of only examining that which would inculpate a defendant, but not looking at other aspects which would exculpate him, ... the Government is also, to balance that out, without burden shifting, allowed to seek a judicial notice" about the defense's opportunity to conduct its own testing.

**16.** We note that it is far from clear that appellant is entitled to complain of the court's rulings where he did not call his experts to testify and where, as a consequence, we cannot know precisely what question(s) the prosecutor would have asked and how the court would have ruled on any objection. The prosecutor had to consider whether its use of rebuttal questioning of the type the court's rulings allowed "might be deemed reversible error on appeal," *Ohler v. United States*, 529 U.S. 753, 758, 120 S.Ct. 1851, 146 L.Ed.2d 826 (2000), and thus the prosecutor may or may not have elected to ask the defense fingerprint expert about whether he had had an opportunity to analyze the latent prints found on the kitchen window or the T-shirt found in the recycling bin. As the Supreme Court reasoned in *Ohler*, "[o]nly when the government exercises its option to elicit the [rebuttal] testimony is an appellate court confronted with a case where, under the normal rules of trial, the defendant can claim the denial of a substantial right if in fact the district court's *in limine* ruling proved to be erroneous." *Id.* at 759, 120 S.Ct. 1851. In this case, appellant could have called his experts to give the desired testimony and—if the government pursued the questioning the court's advance rulings allowed or the court gave a *Teoume–Lessane*-type notice, and if guilty verdicts ensued despite the defense experts' testimony—

pears, however, that, even before the court's September 8, 2010, ruling, the defense had notified the government that it "did not intend to call [its] fingerprint expert." Moreover, the jury learned through the testimony of the government's fingerprint expert, Bennett, that no other prints lifted from locations in the house could be matched to appellant[17]—essentially the same information appellant argues he was precluded from presenting through his own expert. In addition, despite what appellant claims was his lost opportunity to call the defense experts to testify that appellant's DNA and fingerprints were not found in the house (other than his fingerprints on the window sill), defense counsel was able to argue in closing, without objection, that "[n]one of Mr. Gee's DNA was found inside the location" and that "[t]here's no fingerprint evidence inside the house," even though, as the jury had heard, officers "went to the trouble to essentially swab the whole house." Moreover, we think that if the defense experts had testified about their examination of other fingerprints in the house or analysis of other DNA found in the house, and nothing was mentioned about their having had the opportunity to analyze the prints found on the kitchen window and the DNA from the T-shirt found in the recycling bin, one of two consequences would have followed: either the jury would have assumed that the experts were not challenging the government experts' findings (meaning that the defense experts' testi-

mony would have done nothing to undermine the government experts' testimony tying appellant to the open kitchen window and to the T-shirt stained with Moretta's blood); or—unfairly—the jury would have assumed that the government had withheld from the defense experts evidence they might have tested (the very harm the court's rulings were directed at preventing). Accordingly, appellant's arguments do not persuade us that the trial court's rulings amounted to reversible error.

For all the foregoing reasons, we reject appellant's arguments that the trial court's rulings in reliance on *Teoume–Lessane* violated his rights to cross-examine witnesses and to present defense expert testimony and improperly shifted the burden of proof.

## III.

■ Appellant next argues that the trial court erroneously permitted Brown, Behr, and Johnson to provide "expert testimony" when "none had been previously designated as expert witnesses in the case[.]"[18] Their testimony, appellant asserts, was prejudicial because it bolstered the government's circumstantial case. We reject this claimed ground for reversal because we conclude that the testimony in question by Behr and Brown was admissible as lay opinion testimony and that the challenged testimony by Johnson was cumulative of other testimony.

he could then have raised these matters on appeal as errors entitling him to reversal. The ruling in *Ohler* suggests that appellant may be foreclosed from doing so now, having preempted the effect of the trial court's rulings by not calling his experts.

**17.** Specifically, Bennett testified that none of the (more than twenty) other prints lifted from the house was "useful for identification purposes," since those prints lacked "enough

identifying ridge characteristics to effect an identification."

**18.** Appellant also complains of the prosecutor's question to Shaffer about whether "any of the puncture wounds [in Moretta's body] appear[ed] to be near her heart[.]" We need not address this issue other than to observe that Shaffer's "I don't recall" answer rendered the question harmless, even if, *arguendo,* it called for expert testimony.

■ Opinion testimony by lay witnesses is admissible if it is "limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the [witnesses'] testimony or the determination of a fact in issue," *Sanders v. United States,* 809 A.2d 584, 595 (D.C.2002) (internal quotation marks omitted), and, per FED.R.EVID. 702, it is not based on "scientific, technical, or other specialized knowledge." *See also Bedney v. United States,* 684 A.2d 759, 767 (D.C. 1996) ("A non-expert witness may express opinions when testifying, so long as they are based on the witness' personal observation of events and are helpful to the jury in fulfilling its role as fact-finder.") (citation omitted). Lay opinion testimony "is particularly valuable where ... the lay witnesses are able to make the challenged identifications based on their familiarity with characteristics ... not immediately observable by the jury at trial." *Sanders,* 809 A.2d at 595. "Whether an opinion is helpful to the jury and hence admissible is a question entrusted to the sound discretion of the trial court, and its admission of such testimony will not be overturned unless it constitutes a clear abuse of discretion." *Keels v. United States,* 785 A.2d 672, 677 (D.C.2001) (internal quotation marks omitted).

■ Appellant's focus on Brown's and Behr's statements no doubt reflects a recognition that the statements tended to support an inference that the assailant entered through the kitchen window, where appellant's fingerprints and palm print were found. Appellant asserts that Officer Brown provided "crime scene reconstruction" expert testimony when he testified that the fingerprints found on the kitchen window appeared to have been made by fingertips that were "at a slant ... consistent with [someone's] grabbing a window

and lifting it up ... from the outside," and that the scraper at the end of the grill brush found on the kitchen window sill "could be used to pry something open." We agree with the prosecutor's response: that Brown's testimony was not "beyond the ken of the average layperson [to] see three fingerprints, and [to] tell it's the tips of the fingers, [and] to figure out which way they're pointing." We also agree with the trial court's ruling that Brown's grill brush testimony was "within his ... knowledge as a lay person." Further, both items of testimony were helpful to the jury in understanding how the attacker may have entered the home.

■ Appellant raised a similar objection to Behr's testimony that "[i]t was upsetting to come to the house and see that someone had come in through the window." Behr testified that she had that impression upon seeing that the patio chair had been moved from "where [she had] left it"; that the barbecue scraper was on the window sill; that the screen was "shoved up" into the window frame; and that several items were "knocked over" into the kitchen sink. For the reasons discussed above, we are satisfied that Behr's statements, too, constituted permissible lay testimony. Behr's statements, which were based on her personal knowledge about the arrangement of her home and on her perceptions when she returned after the crime, did not require any specialized knowledge.

■ As to Officer Johnson, the testimony in issue came in the context of the prosecutor's questioning about the responses of canine-unit dogs that were used (unsuccessfully) at the crime scene sometime after the attack. Officer Johnson answered in the affirmative when the prosecutor asked, "[I]s it your understanding that K9s are only effective, if it's the very first scent?" Further, Officer Johnson

agreed with the prosecutor that the canine search was of "limited value" because "there w[ere] so many people in the alley" adjacent to the crime scene. The government concedes, and we agree, that "the abilities of a trained police search dog may be proper subjects for expert, as opposed to lay, testimony." However, as the government points out, Sergeant James Ginger, who testified that he was assigned to the MPD Canine Patrol Unit as a supervisor and had worked in that capacity since 1998, gave substantially similar testimony, to which appellant did not object.[19] Moreover, appellant has not suggested, and the record does not establish, how Officer Johnson's testimony influenced the outcome of the trial.

## IV.

 During the trial proceedings on September 13, 2010, defense counsel sought leave of court to cross-examine the government's fingerprint expert, Haywood Bennett, by reading or quoting excerpts from the 2009 National Academy of Sciences report entitled "Strengthening Forensic Science in the United States: A Path Forward" (the "NAS Report" or the "Report").[20] The prosecutor objected, explaining that the portion of the Report defense counsel had bracketed (and thus indicated he wished to use) cited "Law Review articles," including a Minnesota Law Review article entitled "Procedural paradigms for applying the *Daubert* test," and that "it's not fair to ask a person who is an expert in the [fingerprint analysis]

field about these legal opinions that some law professor is writing."[21] Defense counsel said that he was no longer proposing to use "the whole report" and that his "main concern" was the section of the Report beginning at page 136 (i.e., a section spanning pages 136–145, entitled "Friction Ridge Analysis"). He added that, "[m]ore particularly," he sought to use "the conclusions in the report ... that there was no scientific basis for fingerprint examination." The trial court, which told the parties earlier that it had "read the report," responded:

> Well, let's be careful here. That's why we need to air this out. Because I think there are parts of the report which may very well be [used for] cross examination as [a] learned treatise. But I don't believe the report found what you say it found.[22]

The court concluded the discussion that day by asking defense counsel to give the court a copy of the Report with the portion counsel intended to use bracketed or highlighted.

The following day, the court took up again the issue of "whether or not this NAS report constitutes a learned treatise such as is defined in the rule," meaning that "it is authoritative in the field and therefore it can be used to cross-examine experts." The court explained its understanding that "even if it is [generally] considered to be a learned treatise," that conclusion might not apply to "every part of it"; rather, "you literally have to go sec-

---

**19.** Sergeant Ginger stated, *inter alia*, that "[t]he more foot traffic around, it's bad because the dog only tracks the freshest scent."

**20.** *See* NATIONAL RESEARCH COUNCIL OF THE NATIONAL ACADEMIES, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (National Academies Press 2009) (hereinafter cited as "NAS Report").

**21.** The trial court agreed that it was not "appropriate for the defense to be quoting a legal opinion."

**22.** *Cf. Pettus v. United States*, 37 A.3d 213, 227 (D.C.2012) (rejecting as "exaggerate[d]" the argument that the Report "reject[s] the scientific basis for all pattern-matching analysis").

tion by section, sentence by sentence." The court observed that "[b]ased on what [it had] received with the brackets, there's clearly at least one or two bracket[ed] portions which seem[ ] to me not appropriate to cross-examine on." The court then invited the parties to address whether the portions of the "Friction Ridge Analysis" section of the Report bracketed by the defense constituted a learned treatise.

Citing his interaction with members of the Scientific Working Group, government counsel responded:

> The relevant scientific fingerprint community does not consider the NAS Report a learned treatise. The people on the scientific working group on fingerprints, SWGFAST, do not consider it a learned treatise. The FBI at Quantico does not consider it a learned treatise. The fingerprint unit at Scotland Yard does not consider it a learned treatise. These are the leaders in the field. These are the people that are brought together to issue protocols and standards for those folks who are practicing in the field. And they don't consider it a learned treatise. What they consider it to be is a policy statement[.]

The court next asked counsel for both sides whether they were aware of any court having "admitted or not admitted portions of the NAS report as a learned treatise." Counsel for both sides stated that they were unaware of any case in which a court had ruled that the Report was either admissible or inadmissible as a learned treatise for purposes of cross-examination. The court then concluded the day's discussion of the issue by observing that "[t]here are a couple of parts [of the Report] which I disagree with."

Discussion of the learned treatise issue resumed the next day. Government counsel again objected to the Report "being designated as a learned treatise," but com-

mented that much of what defense counsel had bracketed, including an explanation of the so-called ACE–V (Analysis, Comparison, Evaluation, and Verification) methodology and other material found on pages 136–39 of the Report, was "accepted" factual material or not "particularly controversial" material. He said that the government would not oppose the defense's use of that material for purposes of cross-examination, "with the understanding that what's being asked from this would not be designated as a learned treatise." The government's objections, he told the court, focused on the use of the material bracketed by defense counsel beginning in the middle of page 141 (and continuing to page 145) of the Report. In particular, government counsel drew the court's attention to the following passage found on page 144 of the Report:

> Uniqueness and persistence are necessary conditions for friction ridge identification to be feasible, but those conditions do not imply that anyone can reliably discern whether or not two friction ridge impressions were made by the same person. Uniqueness does not guarantee that prints from two different people are always sufficiently different that they cannot be confused, or that two impressions made by the same finger will also be sufficiently similar to be discerned as coming from the same source. The impression left by a given finger will differ every time, because of inevitable variation in pressure, which change the degree of contact between each part of the ridge structure and the impression medium. None of these variabilities—of features across a population of fingers or of repeated impressions left by the same finger—has been characterized, quantified, or compared.

Government counsel said that this passage is not "an accurate representation of what the science is" and does not "represent the views of the relevant scientific community." He noted that a portion of the Report that the defense had *not* bracketed states, "[T]he fingerprint community asserts that the latent print examiner learns to judge whether there is sufficient detail (which varies with image quality) to make a source determination during the evaluation phase of ACE–V."[23] By this statement, government counsel argued, "the [R]eport itself is acknowledging what the relevant scientific community asserts. [T]he relevant scientific community is at odds with what this [R]eport is saying. And that's my basis for saying this [R]eport doesn't represent the views of the relevant scientific community."

The trial court asked government counsel whether government fingerprint expert Bennett would say that the Report "is an authoritative treatise and something that he uses and relies upon." Government counsel responded that Bennett would not, and added, "I don't think any trained fingerprint expert would testify to that." The court then asked defense counsel—who had told the court that the defense would not be calling its own fingerprint expert to testify—how he would show that the portion of the Report he wished to use in cross-examination is "an authoritative treatise . . . subject to the learned treatise exception." Defense counsel responded, "[T]his is a Government publication that has generally been accepted by the scientific community." When the court replied that "just saying it doesn't make it so," defense counsel responded:

Well, it is, because it's noted that it is written by the Government and it has been accepted by the Government, so I don't see how they then can say, well,

we're not accepting it as a learned treatise when—just because maybe this particular fingerprint examiner, maybe all the fingerprint examiners don't know its contents or don't follow the Government's own methodology and learned treatise, but it's clear to me under the definition of a learned treatise that this fits within those four corners. And, in fact, this is a document that's been drafted and accepted by the Government. . . . This is a branch of the Government that has published and written this report. So to say that one branch accepts it and writes it, and the other branch doesn't, I think would be unfair to the defense and belies common sense.

Thereafter, the court ruled as follows:

[I]t seems to me the defense has not demonstrated that the NAS report is a learned treatise as required in the rules[.] . . . [T]o establish the reliability of an authority, it has to be established as a standard treatise on the subject[, and] . . . it must be a reliable authority by the testimony or admission of a witness or by other expert testimony or by judicial notice. And the Court believes it's certainly not in a position to take judicial notice of the NAS report as an authoritative treatise. There are many parts in it which I had indicated seemed, well, not innocuous, but common sense and understandable, and I think you can cross-examine on those points.

But I don't think, under these circumstances, that it's been shown to the Court by appropriate evidence that it's been established by a reliable authority, by the testimony or admission of a witness or other expert testimony within the relevant field. And, as such, I don't believe it's appropriate to give it at this

---

**23.** NAS Report at 141.

stage the benefit of being considered a learned treatise.

Mere publication itself does not render a text a reliable authority. You certainly can demonstrate a text['s] authoritativeness if other professionals in the field regard the text as trustworthy. And, you're certainly welcome to ask Mr. Bennett if he regards it as authoritative. But absent other evidence to the contrary, the Court doesn't believe that the requirements for establishing it have been met in this particular case. The fact that the Government funded this document doesn't make it, in and of itself, a learned treatise.

. . . .

. . . You're not permitted to use the NAS report as a basis to quote it as a learned treatise with this witness, such as aren't you aware of the NAS report, and then read out, if it was a learned treatise, that particular part.

Appellant now argues that the trial court erred in precluding the use of the NAS Report, which he contends was admissible for both substantive and impeachment purposes. He asserts that the trial court's ruling curtailed his right to confront his accuser Bennett, who "provided the only testimony that physically linked [appellant] to the Moretta home by way of his expert identification of [appellant's] prints on a window of the home."

■ The learned treatise exception to the hearsay rule is set out in Rule 803(18) of the Federal Rules of Evidence. Rule 803(18) provides:

A statement contained in a treatise, periodical, or pamphlet [is admissible notwithstanding the general rule against hearsay] if: (A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and (B) the publication is established as a reli-able authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice. If admitted, the statement may be read into evidence but not received as an exhibit.

FED.R.EVID. 803(18); see Washington v. United States, 884 A.2d 1080, 1096 (D.C. 2005) (noting that the federal rule "appears consistent with D.C. law and practice") (internal quotation marks omitted). The party seeking to rely upon a written authority has the burden to establish that it is authoritative. See In re Ty.B., 878 A.2d 1255, 1265 (D.C.2005) ("[I]t is clearly the burden of the party seeking . . . admission [of a hearsay statement], to identify the appropriate exception and to demonstrate that the testimony fell within it.").

As the discussion above indicates, appellant did not establish that the "Friction Ridge Analysis" section of NAS Report is a reliable authority by an "expert's admission or testimony." FED.R.EVID. 803(18)(B). Government expert Bennett did not (and according to the government's proffer, would not) testify that the Report is a reliable authority, the defense had decided not to call its own fingerprint expert to testify before the jury, and the defense did not otherwise—through voir dire, or through an affidavit or otherwise—provide the court with expert testimony "to establish the trustworthiness of [that section of the Report] as viewed by professionals in that field." Schneider v. Revici, 817 F.2d 987, 991 (2d Cir.1987). Accordingly, appellant's argument that the trial court erred in not allowing the "Friction Ridge Analysis" section of the Report to be used in cross-examination as a learned treatise comes down to an argument that the court abused its discretion in not taking "judicial notice" of it as a reliable authority. FED.R.EVID. 803(18)(B).

For several reasons, we cannot agree that the trial court abused its discretion in declining to take judicial notice of the "Friction Ridge Analysis" discussion in the NAS Report as a learned treatise. We note first that the trial court had read the Report; the court was sufficiently familiar with its content that it was able not only to observe that many parts of it are "common sense and understandable" and that portions of it "may very well be [used for] cross examination as [a] learned treatise," but also to dispute defense counsel's characterization that the Report found "no scientific basis for fingerprint examination." The court also confirmed that, to the parties' knowledge, no other court had accepted the relevant portions of the Report as a learned treatise. On this record, we cannot say that, in exercising its discretion as to whether to take judicial notice of the Report, the court proceeded without "a firm factual foundation." *Johnson v. United States*, 398 A.2d 354, 364 (D.C.1979).

 Second, a trial court errs if it takes judicial notice "without determining that . . . the sources relied upon have an accuracy that cannot reasonably be questioned[.]" *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1076 (7th Cir.1997) (citing Fed.R.Evid. 201(b) ("Kinds of Facts That May Be Judicially Noticed")). Here, the court observed that it disagreed with "a couple of parts" of the Report. Appellant did not ask the court to specify the portions of the Report with which it disagreed, leaving us with no basis for rejecting the court's view, and making it difficult for us to find error in the court's refusal to take judicial notice of the Report as a source whose "accuracy . . . cannot reasonably be questioned." *Id.* at 1076.

Third, the court did not err in declining to take judicial notice of the Report solely on the ground—the major ground urged by defense counsel—that it is a "Government publication." *Cf. Dawsey v. Olin Corp.*, 782 F.2d 1254, 1263–64 (5th Cir. 1986) (holding that the trial court "correctly prohibited" plaintiffs from using statements contained in a National Institute of Occupational Health and Safety (NIOSH) manual issued by the former Department of Health, Education, and Welfare, where no witness testified that the manual was a reliable authority). Fourth, although defense counsel baldly asserted that the Report "has generally been accepted by the scientific community," he did not provide a sufficient answer to government counsel's proffer and ostensible demonstration that statements in the "Friction Ridge Analysis" section of the Report do not represent the views of Scientific Working Group or others in the relevant scientific community. *Cf. Schneider*, 817 F.2d at 991 (stating that "[f]ailure . . . to lay a foundation as to the authoritative nature of a treatise requires its exclusion from evidence because the court has no basis on which to view it as trustworthy"); *K.G. v. Dudek*, 839 F.Supp.2d 1254, 1266–67 (S.D.Fla.2011) ("[B]ecause Defendant did not provide any sworn testimony regarding these articles (or the underlying studies), either through testimony at the hearing or through affidavits or declarations, the Court is unable to assess the reliability of these articles.").[24]

---

24. In his brief to this court, appellant makes much of the fact (which he did not mention during his colloquy with the trial judge) that the majority opinion in *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), contains several citations to the NAS Report. *Id.* at 318–21, 129 S.Ct. 2527. However, the opinion cites the Report in support of the point that "[c]onfrontation is one means of assuring accurate forensic analysis"; specifically, the opinion quoted the Report's statements that "forensic scientists . . . sometimes face pressure to sacrifice appropriate methodology for the sake of expediency," *id.* at 318, 129 S.Ct. 2527 that there is "wide variability across forensic science disciplines

■ In addition, we read the trial court's comment that many parts of the Report are "common sense and understandable" as implying that, in the court's view, some portions are not, and we cannot fault the trial court for not allowing defense counsel to read portions of the "nuanced"[25] Report into the record for the jury to evaluate on its own, without expert assistance. As we have observed, the learned treatise exception to the hearsay rule "permits the admission of learned treatises as substantive evidence [but] only when an expert is 'on the stand and available to explain and assist in the application of the treatise'" *Warren v. Medlantic Health Group, Inc.*, 936 A.2d 733, 747 (D.C.2007) (quoting *Washington*, 884 A.2d at 1095 (quoting FED.R.EVID. 803(18) advisory committee's note)). "The reason for the rule is to avoid jury misunderstanding and misapplication of technical information in the treatise or article that might occur if the jury were permitted to consider the publication itself instead of receiving the information through the testimony of an expert in the field." *Washington*, 884 A.2d at 1095 (internal quotation marks omitted). When that condition is not satisfied, a trial court does not abuse its discretion in precluding counsel from reading from the document during cross-examination. *Warren*, 936 A.2d at 746, 747 (holding that the trial court properly exercised its discretion where it "permitted counsel to proceed with the cross-examination so long as it fell into the category of impeachment, without reading from the [document that the expert had not relied on and

with regard to techniques, methodologies, reliability, types and numbers of potential errors, research, general acceptability, and published material," *id.* at 320–21, 129 S.Ct. 2527 and that "[t]he forensic science system, encompassing both research and practice, has serious problems that can only be addressed by a national commitment to overhaul the current structure that supports the forensic science community in this country." *Id.* at 319, 129 S.Ct. 2527. The opinion also refers to the Report's discussion of "documented cases of fraud and error involving the use of forensic evidence" and its discussion of "problems of subjectivity, bias, and un-reliability of common forensic tests such as latent fingerprint analysis, pattern/impression analysis, and toolmark and firearms analysis." *Id.* at 319, 321, 129 S.Ct. 2527. *But see id.* at 351, 129 S.Ct. 2527 ("The Court . . . errs when it relies in such great measure on the recent report of the National Academy of Sciences.") (Kennedy, J., dissenting).

*Melendez–Diaz* did not cite the Report for its particular statements about fingerprint analysis, such as the statement on page 144 of the Report, quoted *supra*, questioning whether "anyone can reliably discern whether or not two friction ridge impressions were made by the same person." On the issue that was before the trial court—whether the relevant scientific community accepts such statements in the Report as authoritative—there is post-Report commentary that appears to be consistent with government counsel's proffer that the answer to that question is "no." *See, e.g., United States v. Rose*, 672 F.Supp.2d 723, 725–26 (D.Md.2009) (noting that the Report "provoked debate and response from the relevant scientific community, including both SWGFAST and [the International Association for Identification]," and that "[w]hile these groups support many of the NAS recommendations, they strongly resist the conclusion . . . that fingerprint identification has been shown unreliable"); *see also* Joseph P. Bono, Commentary, *The Need for Research Culture in the Forensic Sciences*, 58 U.C.L.A. L.REV. 781, 787 (Feb.2011) (commentary by the President of the American Academy of Forensic Sciences on a new treatise that, "unlike the committee that prepared the NAS Report, . . . presents an impartial cross-sectional perspective on how to strengthen forensic science"); *People v. Gonzalez*, No. E052000, 2012 WL 591383, at *2, 2012 Cal.App. Unpub. LEXIS 1294, at *7 (Cal.App.4th Dist. Feb. 22, 2012) (noting that the Report "was compiled by a committee of forensic scientists, statisticians, judges, and lawyers but no fingerprint examiners").

25. *Pettus*, 37 A.3d at 227.

whose application he could not assist in explaining]").

Finally, we note that despite the court's ruling that the Report could not be used as a learned treatise, defense counsel made effective use of the Report's content during his cross-examination of Bennett. Defense counsel had told the court that the Report cites publications that "specifically discuss how a forensic analyst is to conduct not only lifting the prints, but also to conduct the assessment of the prints pursuant to the ACE–V method," and that he "believe[d] those [were] proper areas for cross-examination" of Bennett about the protocols Bennett followed in this case. Although somewhat limited[26] by the court's ruling, defense counsel elicited from Bennett testimony that he was not familiar with SWGFAST documentation standards, that he was not required to "work under SWGFAST standards," and that he had not followed those standards in analyzing the fingerprints in this case. Bennett also responded to several questions concerning the manner in which he documented his findings, questions that appear to reflect the Report's discussion about "sufficient documentation" as an "important issue[ ] for the latent print community." NAS Report at 143. Further, the section of the Report that defense counsel wanted to read for purposes of cross-examination states, *inter alia*, that "the outcome of a friction ridge analysis is not necessarily repeatable from examiner to examiner," and that fingerprint analysis involves "subjective assessment[s]." NAS Report at 139, 141. On cross-examination, Bennett was asked about and acknowledged the "subjective basis of his analysis"

and also acknowledged that he had been "wrong before . . . in [his] examination . . . of [fingerprint] identifications." Thus, although appellant was not able to cite to or quote from the NAS Report, it appears to us that the questioning defense counsel pursued on cross-examination addressed the concerns raised in the Report. Accordingly, for all the foregoing reasons, we reject appellant's claim of reversible error with respect to the court's ruling on the learned treatise exception.

## V.

When trial resumed on September 15, 2010, the prosecutor informed the court that, the night before, she saw a document she had "never seen before" and thus had previously "inadvertent[ly]" failed to provide it to the defense team. The document, which the prosecutor emailed to defense counsel on the night of September 14, was a copy of Detective Turner–Covington's notes taken during the December 2008 interview of Moretta when Detectives Turner–Covington and Carmichael went to Houston to show her a photo array. In her notes, Detective Turner–Covington recorded Moretta's description of her attacker as a person of "Middle Eastern" descent (unlike appellant, who is African–American). The prosecutor told the court that she had Detective Turner–Covington available if the defense wanted to call her.[27] The defense, however, moved to dismiss all charges with prejudice or in the alternative to strike the testimony of Moretta, arguing that appellant was significantly prejudiced by an inability to cross-

---

**26.** We say "somewhat" because nothing prevented the defense from using Scientific Working Group publications or peer-reviewed journal articles cited in the Report as learned treatises, something to which the government has indicated it would not object.

**27.** The prosecutor also told the court that if she had seen the notes earlier, she would have asked Moretta what she meant by "Middle Eastern descent." The prosecutor recognized that the government was "stuck with her answer now."

examine Moretta about the description[28] and—with the government's having just about completed its presentation of witnesses—an inability to cross-examine other witnesses using the information in Detective Turner–Covington's notes.

The trial court, stating that it could not find that the delayed disclosure of the notes had been deliberate or in bad faith, denied the motion to dismiss and declined to strike Moretta's testimony. The court found there was no *Brady*[29] violation, in that appellant was not prejudiced by the delayed disclosure. The court reasoned that although defense counsel had been unaware of the existence of Detective Turner–Covington's notes, the defense "had that basic fact for a very long time" and "in fact, did use it during the course of cross-examination" of Moretta. The court's comment referred to the fact that, during cross-examination of Moretta on September 8, defense counsel had questioned her about the same information contained in Detective Turner–Covington's notes. Specifically, defense counsel—who explained to the court that he had a "good-faith basis" for asking the question because he had "a report that indicates that"[30]—asked Moretta, "[Y]ou told Detective Carmichael that . . . the perpetrator was Middle Eastern, did you not?" When Moretta denied making the statement, defense counsel then asked, "And so if Detective Carmichael's report indicates that you told him that the person was Middle Eastern, that would be incorrect?" The trial court reasoned that the defense team had cross-examined Moretta "as if they had the appropriate document" and had completed their cross-examination of her and made adequate use of the information. Looking at a transcript of Moretta's cross-examination, the court reasoned that it did not know what else Moretta could say since she had already denied making the statement, but stated that "[i]f I believed that her physical presence here was required to complete the cross-examination, I would certainly order that, or the Government would face sanctions." The court also explained that defense counsel would not have been entitled to confront Moretta with Detective Turner–Covington's notes since the notes were "from someone else," but that Detective Carmichael, whom the prosecution planned to call, could "come and complete the impeachment."

 Appellant argues that the trial court erred in declining to sanction the government for a *Brady* violation. Upon this record, we agree with the trial court that there was no true *Brady* violation. "For there to be a true *Brady* violation: (1) the evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching; (2) that evidence must have been suppressed by the [government], either willfully or inadvertently[;] and[ ] (3) prejudice must have ensued." *Fortson v. United States*, 979 A.2d 643, 662 (D.C.2009) (alteration in original, internal quotation marks omitted).

---

**28.** Moretta, who never returned to the house on 14th Street after the attack, came back to the District of Columbia to testify during the government's case, but immediately thereafter went back to Texas.

**29.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**30.** As explained by the prosecutor, what the defense had was a report, prepared by Detective Carmichael and turned over in discovery, that Moretta's mother had called to say that, during a flashback episode, Moretta told her mother that the attacker had "North African features and his parents might be from the Middle East." (Moretta testified that during the months after the attack, the incident took a psychological toll that included her suffering from flashbacks, night terrors, and panic and anxiety attacks.)

"To satisfy the prejudice component, the withheld evidence must be material; that is, there must be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (internal quotation marks omitted). Here, we see no reasonable probability that the result of appellant's trial would have been different if Detective Turner–Covington's notes had been disclosed to the defense earlier. Although the defense belatedly received Detective Turner–Covington's notes, it had already confronted Moretta with the statement during her testimony on September 8; it subsequently had the opportunity to cross-examine Detective Carmichael about his testimony (on September 15) that Moretta told him during the interview in Houston that her assailant was of "Middle East descent"; and it called Detective Turner–Covington during the defense case to confirm that her notation "Middle Eastern descent" was written contemporaneously with Moretta's giving that description of her attacker. We discern no reason to disagree with the trial court's assessment, which was, "I don't see any prejudice."[31]

Also weighing in favor of the conclusion that the prejudice component was not satisfied is the fact that Moretta, who testified that she was focused on the knife during the attack, explained that she had only a brief moment to view her hooded attacker.

 Appellant also argues that the trial court erred in denying his motion for a mistrial. Appellant made that motion after the government introduced—during its rebuttal case, and without prior disclosure to the defense during discovery—a photograph of appellant that was taken in 2007 and that shows him wearing a black hooded sweatshirt (i.e., a dark-colored hoodie that generally matched Moretta's description of what her attacker was wearing).[32] The trial court reasoned that the defense had opened the door to evidence showing that appellant owned a hooded shirt at the time of the attack when defense counsel asked Detective Carmichael whether he had recovered "any bloody hoodie from [appellant's] home" and elicited a negative response. The court ruled that the gov-

---

**31.** Appellant argued in the trial court that he was prejudiced by the delay in production on the additional ground that he learned only belatedly that Detective Turner–Covington's notes include a reference to Moretta's statement that, on her way home prior to the attack, she saw a group of "four to five black males on the [subway] train who appeared to be really drugged out" and who "seemed strange" but "never said anything to her." Appellant told the trial court that this information "creates the possibility that ... these four or five black males ... could have been involved." Appellant apparently has abandoned this argument, as he does not re-assert it in his brief on appeal. In any event, as the government argues, the information may have been more inculpatory than exculpatory (since it described a group to which appellant might have belonged). The prosecutor offered to get Moretta on the telephone to be questioned about the comment, but the defense did not pursue that suggestion.

Appellant's brief also alludes to the "late disclosure of Jencks material," but does not identify any witness statement that was not turned over by the end of the witness's direct testimony, which is what the Jencks Act requires. *See* 18 U.S.C. § 3500(b) (*"After a witness called by the United States has testified on direct examination,* the court shall, on motion of the defendant, order the United States to produce any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.") (emphasis added); Super. Ct.Crim. R. 26.2(a) (embodying the quoted Jencks Act provision).

**32.** The photograph was taken in connection with a prior arrest, but the trial court observed that there was "nothing [about the photo] that indicates it's an arrest photo at all."

ernment would be permitted to ask the detective whether he had found "a photograph of [appellant] wearing a hoodie in October of 2007" and to introduce the photograph, to rebut the implication that appellant did not own a hooded shirt.[33]

Appellant contends that he was entitled to relief for the government's failure to comply with its discovery obligations under Super. Ct.Crim. R. 16(a)(1)(C). Under Rule 16(a)(1)(C), a criminal defendant has a right to discover photographs in the government's possession, custody or control that are "material to the preparation of the defendant's defense, or are intended for use by the government as evidence in chief at the trial[.]" The government did not use (and appellant cites no evidence that it intended to use) the photograph in its case-in-chief. As described, it was only upon defense counsel's inquiry into whether Detective Carmichael had recovered a hooded shirt from appellant's home that the prosecution sought to admit the photograph. Further, even assuming that the photograph was "material to the preparation" of the defense's case,[34] we cannot conclude that the trial court abused its discretion by failing to impose sanctions for non-disclosure. Where a defendant is entitled to but is denied discovery, and the trial court denies a request for sanctions, our inquiry is whether the nondisclosure substantially prejudiced the defendant. See *Ferguson v. United States*, 866 A.2d 54, 59, 65 (D.C.2005). That is, we "must determine the likelihood that the verdict would have been different had the government complied with the discovery rules." *Id.* at 65 (internal quotation marks omitted). Here, we discern no reason to think that the outcome would have been different if the photograph (of appellant wearing, a year before the attack on Moretta, what appears to be a very common article of clothing) had been disclosed during discovery. Appellant presumably knew that he owned a dark hooded shirt and that he had been photographed in one, and thus he could not have been surprised by the photograph. Moreover, appellant has not suggested how (and we do not see how) early disclosure of the photograph would have enabled him to undermine the government's case, which was largely based on the DNA and fingerprint evidence and not on Moretta's (inconsistent) descriptions of her attacker.

## VI.

 Finally, appellant challenges the sufficiency of the evidence to support his attempted first-degree sexual abuse conviction. He argues that the government failed to introduce "any forensic, physical, or other evidence in the case to support the sexual assault charge . . . beyond [the victim's] statement that she was under the impression that the assailant wanted to rape her" during the physical assault.

 To prove attempted first-degree sexual abuse while armed, the government must prove beyond a reasonable doubt that the defendant came "dangerously close"[35] to completing the crime and that

---

**33.** Pursuant to that ruling, the prosecutor asked Detective Carmichael on redirect examination, "In the course of your investigation, did you find a photograph of [appellant] wearing a hoodie in October of 2007?" The photograph in question was introduced after the detective responded that he had located such a photo.

**34.** *Cf. Beaner v. United States*, 845 A.2d 525, 536 (D.C.2004) ("Whether evidence is 'mate-

rial' requires a prospective evaluation, from the point of view of the defendant prior to trial, of whether the evidence has potential value for the defendant's development of a defense.") (internal quotation marks omitted).

**35.** *See* Criminal Jury Instructions for the District of Columbia, No. 7.101 (5th ed. rev. 2011).

the defendant intended to use "force to cause another person to engage in or submit to a sexual act." *Hatch v. United States,* 35 A.3d 1115, 1116 (D.C.2011); *see also Nkop v. United States,* 945 A.2d 617, 620 (D.C.2008) (noting that proving attempted sexual abuse requires the government to show that the defendant "(1) intended to commit the crime, and (2) committed an overt act towards completion of the crime that (3) came within dangerous proximity of completing the crime" (internal quotation marks omitted)). Here, as already described, Moretta testified that while attempting to escape, she had fallen into a position in which she was on her hands and knees, and that the assailant grabbed her from behind and pulled her closer to him. She further testified that she was clothed only in a T-shirt and underwear and that she heard the attacker unzip his pants and say either, "Shut up, bitch" or "Come here, bitch" just before he pulled down her underwear. She "look[ed] back at one point," and saw that the attacker, who had stopped stabbing her, was on his knees, "a little bent back," and "his torso was like up, exposed." "[T]he position he was [in] on the floor gave [her] the impression" that he was going to rape her.[36]

■ "[V]iew[ing] the evidence in the light most favorable to the government, [and] giving full play to the right of the fact finder to determine credibility, weigh

the evidence, and draw justifiable inferences of fact," as we must, *In re D.W.,* 989 A.2d 196, 208 (D.C.2010) (internal quotation marks omitted), we conclude that there was sufficient evidence from which the jury could infer that appellant intended to force Moretta to engage in a sexual act.[37] In *D.W.,* we held that there was sufficient evidence to convict the defendant of attempted first-degree child sexual abuse, an offense which, in the context of the case, required proof of an attempt to penetrate the victim's anus or vulva. We were satisfied that the evidence was sufficient to establish beyond a reasonable doubt that D.W. committed "an overt act done with the intent to commit [first-degree child sexual abuse], ... which, except for some interference, would have resulted in the commission of the crime,"[38] where the victim testified that he "forced her onto her back on the floor, got on top of her, pulled off his shirt and shoes, and then tried to unbutton her pants and refused to stop when she said, 'no.'" *Id.* (internal quotation marks omitted). Particularly supportive of that conclusion were D.W.'s "efforts to undress himself and her and to get on top of her on the floor," from which, we held, "[t]he court could reasonably infer that D.W.'s 'overt acts' were done with an intent to penetrate R.T.'s vulva or anus...." *Id.* at 208–09. So here. Moretta's testimony that she heard her attacker unzip his pants, saw his torso exposed, felt him pull down her under-

---

**36.** Moretta also testified that at the time of the attack, she was wearing pearl earrings, a necklace with pearls and three small diamonds on it, and a "very expensive watch," but that the assailant did not seem to be interested in (and did not take) those items. From this, and from the fact that the assailant had stopped stabbing Moretta, the jury could infer that his motive in pulling her close to him was something other than robbery.

**37.** "[I]t is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that we may reverse a conviction on sufficiency grounds." *In re D.W.,* 989 A.2d at 208 (internal quotation marks omitted).

**38.** *Id.* (alteration in original) (internal quotation marks omitted).

wear, and felt him pull her body from behind toward his body while she was on her hands and knees trying to escape, enabled the jury reasonably to infer that the attacker committed overt acts with the intent to commit first-degree sexual abuse and that he came "dangerously close" to forcing Moretta to submit to a sexual act.

## VII.

For the foregoing reasons, appellant's convictions are hereby

*Affirmed.*

